DETROIT TRUST CO. *v.* DETROIT CITY SERVICE CO.

1. MORTGAGES—FIXTURES—CHATTELS—REPLACEMENTS.

Under mortgage covering real estate and certain personal property used in ice business, and providing that chattels conveyed or intended to be conveyed were to be regarded as fixtures, *held*, that ammonia compressors, aerating equipment, boilers, motors and refrigerating units, freezing tanks, air compressors, condensers, engines, oil tanks and pumps, platform scales, scorching machines, and other machinery for manufacturing ice, are fixtures, as also are spare motors, parts, machinery, etc., which constitute replacements specially adapted to full enjoyment of realty.

2. SAME—CHATTELS—INTENT.

In distinguishing between fixture and chattel, when neither is annexed to freehold, use, nature, and intention of parties must be considered.

3. SAME—PERSONAL PROPERTY—CORPORATIONS.

As between ice company and its general creditors, horses, wagons, trucks, automobiles, and other movable property of such character that they could be moved from place to place without impairing their value or that of realty from which they are removed, and which are not covered as ''fixtures'' under mortgage, are to be regarded as chattels.

4. COURTS—STARE DECISIS—EQUITY.

Rule of *stare decisis* generally determines, even though equitable considerations might prompt different result.

5. SAME—STATE COURTS—FEDERAL COURTS—STATUTES—CONSTRUCTION.

State court is not bound by decision of Federal Supreme Court in construction of State statute.

6. CHATTEL MORTGAGES—FAILURE TO FILE—SUBSEQUENT CREDITORS WITHOUT NOTICE PROTECTED—STATUTES.

Under 3 Comp. Laws 1929, § 13424, providing that failure to file chattel mortgage shall make it absolutely void as against creditors of mortgagor, and as against subsequent purchasers

or mortgagees in good faith, unless accompanied by immediate delivery followed by actual and continued change of possession of property mortgaged, only subsequent creditors without notice are protected.

7. SAME—NOTICE OF MORTGAGE.

Where second mortgage recited that it was subordinate to liens of first mortgage on both real and personal property, trustee under second mortgage and creditors extending credit after second mortgage was properly filed both as real estate and chattel mortgage may not avoid notice of first mortgage, although it was never properly filed as chattel mortgage.

8. SAME—RECORDING—CONSTRUCTIVE NOTICE.

While recording of real estate mortgage does not give notice of its chattel mortgage provisions, filing or recording of later mortgage in proper office where prior mortgage should have been filed or recorded does give constructive notice of prior instrument, if specific reference to it is made therein, not only of its existence, but also of provisions contained therein.

9. SAME—NOTICE—BILLS AND NOTES—NEGOTIABLE INSTRUMENTS. .

Where original purchasers of so-called gold notes had notice of existence of prior unrecorded chattel mortgage, purchasers from them are chargeable with such notice if said notes are nonnegotiable.

10. BILLS AND NOTES—REFERENCE TO EXTRINSIC INSTRUMENT—CONDITIONAL PROMISE TO PAY.

Where language of notes necessitates that trust indenture be regarded as if it were incorporated into and were part thereof, and reference to extrinsic instrument is necessary to determine nature of promise, notes do not contain unconditional promise to pay, and are therefore nonnegotiable.

11. MORTGAGES—TRUST MORTGAGE—ASSIGNMENT OF RENTS AND PROFITS—STATUTES.

Where trust mortgage, after describing mortgaged property, recited, "together with all * * * tolls, rents, revenues, issues, income, product, and profits thereof," and in subsequent article provided for surrender to trustee, on default, of possession of all mortgaged property, etc., and stated that it should be lawful for trustee to receive rents, income, issues, and profits thereof, after notice given as required by statute, sufficient assignment of rents and profits as additional security in event

of default was accomplished, although specific language of statute was not used (3 Comp. Laws 1929, §§ 13498, 13499).

12. SAME—DEFAULT—NOTICE OF ASSIGNMENT OF RENTS—STATUTES.
Where trustee under trust mortgage filed proper notice of default and assignment of rents with register of deeds and served copy thereof on receivers for mortgagor, said service was sufficient to entitle trustee to rents and profits under 3 Comp. Laws 1929, § 13499.

13. SAME—NOTICE TO TENANTS—PAYMENT OF RENTS.
It was proper for tenants of mortgaged property, who had not received notice to pay rent to trustee under trust mortgage, to continue paying rent to receivers (3 Comp. Laws 1929, § 13499).

14. SAME—RIGHT OF TRUSTEE TO RENTS.
Where trustee under trust mortgage had served notice on receivers of assignment of rents under 3 Comp. Laws 1929, §§ 13498, 13499, it was entitled to all rents from property leased to others and paid to receivers, although notice had not been served on tenants, since service on them is required for their protection only.

15. SAME—PROFITS MADE BY RECEIVERS.
Trustee under trust mortgage was not entitled to all profits made by receivers of mortgagor through operation of mortgaged premises and business, although it was entitled to all "rents and profits" after notice to them of assignment of rents under 3 Comp. Laws 1929, §§ 13498, 13499.

16. SAME—COMMON LAW—USUFRUCT—PROFITS.
Under common law, word "profits," when used in connection with rents, meant usufruct of land.

17. SAME—ASSIGNMENT OF RENTS—CONSTRUCTION OF STATUTE.
In view of strict policy followed in this State that mortgagee may not divest mortgagor of possession until after title shall become absolute upon foreclosure of mortgage, statute giving mortgagee under trust mortgage additional remedy or security, in nature of assignment of rents, not allowed under common law, must be strictly construed (3 Comp. Laws 1929, §§ 13498, 13499).

18. SAME—TRUST MORTGAGES—PARTICIPATION IN DIVIDENDS.
Where, in addition to proceeds from sale of mortgaged assets, receivers accumulated large sum of money through operation

of business, which will be available to all creditors, trustee under first mortgage may prove its claim with interest up to date for filing claims by general creditors, and may participate in dividends paid to unsecured creditors, without deduction on account of its security.

19. SAME—DIVISION OF SURPLUS AFTER PAYING MORTGAGE CREDITORS.
Should there be any surplus, after payment of full amount due on first mortgage, plus interest up to date of payment, such surplus is to be pro rated among general creditors, exclusive of those claiming under first mortgage.

20. SAME—STRICT FORECLOSURE—QUASI-PUBLIC UTILITY.
Corporation operating ice manufacturing plant and supplying ice to large community is not *quasi*-public utility, and therefore in foreclosure of mortgage on its real property and fixtures, strict foreclosure should not have been ordered by court.

21. VENDOR AND PURCHASER—FORECLOSURE OF CONTRACT—RIGHT OF REDEMPTION.
There is no statutory right to redeem on foreclosure of land contract.

22. MORTGAGES—RIGHT TO REDEEM STATUTORY.
Right to redeem from mortgage foreclosure sale is statutory one that should be strictly protected except under unusual circumstances, and may neither be enlarged or abridged by courts.

23. SAME—FORECLOSURE—RIGHT TO USE BONDS IN PAYMENT.
Use of first mortgage bonds toward payment for mortgaged property on foreclosure sale, as provided in mortgage, was properly permitted, where sufficient cash was deposited to make necessary cash payments for expenses of foreclosure and *pro rata* distribution to nondepositors.

24. SAME—PAYMENT OF FORECLOSURE EXPENSES—AUDITING.
Expenses of foreclosure sale should be met out of proceeds of sale, and expense of audit should also be added to amount due under mortgage, while other expenses must be borne by receivers.

25. SAME—EXPENSE OF ACCOUNTING.
Expense of accounting, which was provided for in mortgage, should have been added to amount due thereunder, where it did not make transaction usurious.

26. SAME—SALE IN SEPARATE PARCELS—STATUTES.

    3 Comp. Laws 1929, § 14627, contemplates sales of real estate, on foreclosure, in separate parcels when no intervening causes change nature of parcels, or when they are distinct and independent in description, occupancy, and use.

27. SAME—WHEN PROPERTY SOLD AS UNIT—GOOD WILL.

    Where several plants of ice company were used as unit in serving large community, they were properly sold as unit, in mortgage foreclosure sale, especially where mortgaged good will went with mortgaged property, and to have sold separately would have disrupted business.

28. CHATTEL MORTGAGES—FORECLOSURE—RIGHT OF REDEMPTION—EQUITY.

    Although there is no statutory right of redemption from sale of chattel mortgaged property, court may make such provision in exercise of its broad equity powers.

29. SAME—CHATTELS SOLD WITH REALTY—RIGHT OF REDEMPTION.

    Where mortgaged personalty was sold in conjunction with mortgaged property of ice company on foreclosure sale, right of redemption is extended to good will and chattels, by order of court, so that entire plant may be redeemed as unit, provided fair rental be paid for use of said personalty during redemption period, plus sum sufficient to cover depreciation and loss.

30. RECEIVERS—CLOSING RECEIVERSHIP QUICKLY AS POSSIBLE FAVORED BY COURTS.

    Policy of courts has always been to bring receivership to close as quickly as can be accomplished without injury to creditors.

31. MORTGAGES—FORECLOSURE—SALE OF EQUITY OF REDEMPTION.

    Where it appears to be for best interest of all parties to sell equity of redemption, on mortgage foreclosure, trial court is authorized to make such sale, provided upset price, as determined by court after taking into account profits and expenses under receivership for redemption period, is bid.

32. SAME—SALE OF UNMORTGAGED PROPERTY.

    If equity of redemption is sold, all other unmortgaged property should be offered for sale immediately, but if equity of redemption is not sold, then unmortgaged property should be sold at expiration of redemption period.

33. SAME—RIGHT OF BONDHOLDERS BIDDING TO TENDER BONDS—CASH
·  DIVIDENDS.

Bondholders may tender bonds toward payment of amount bid
for mortgaged property, equity of redemption, or unmortgaged
property, but, as to latter two, they may bid only to extent
that amount of bonds held by them shall bear to entire proved
indebtedness of mortgagor; and they may also apply on such
bid such sums as would be paid them as dividends on their
claims from moneys in hands of receivers and to be received
from sale of equity of redemption and unmortgaged property.

34. SAME—DUTY OF BONDHOLDERS BIDDING TO PAY PART IN CASH.

In bidding on mortgaged property bondholders must pay suffi-
cient in cash to pay expenses of sale and to insure that bond-
holders not bidding shall receive in cash *pro rata* share of
amount bid.

35. SAME—DETERMINING AMOUNT OF CASH DIVIDEND.

In determining amount of dividends to be paid fair sum should
be estimated and deducted for fees of receiver, attorneys, and
for all other lawful charges, and may be approximated, subject
to final determination later.

36. SAME—BONDHOLDERS' RIGHTS IN CASH DIVIDEND.

Orders may be made so that bondholders, in making their bid,
may have benefit of their proportion in large amount of cash
to be distributed to creditors.

37. SAME—PROTECTION OF CREDITORS AND CLAIMANTS.

Provision should be made to insure that such privileges as are
conceded to bondholders will interfere in no way with equi-
table cash distribution of dividends to which other creditors
and claimants are entitled.

38. SAME—RIGHT OF CREDITORS TO APPLY CASH DIVIDENDS ON BIDS.

Creditors other than first mortgage bondholders, acting singly
or in groups, may also, on application to court, use such
dividends to which they may be entitled in payment for any
property offered for sale, on terms similar to those allowed
first mortgage bondholders.

Appeal from Wayne; Toms (Robert M.), J.  Sub-
mitted October 7, 1932.  (Docket No. 47, Calendar
No. 36,734.)  Decided March 1, 1933.

Bill by Detroit Trust Company, a Michigan corporation, as trustee, against Detroit City Service Company, its receivers, and others to foreclose a trust mortgage. Bill by Detroit Insurance Agency, a Michigan corporation, and another against Detroit City Service Company, for appointment of a receiver. Cross-bill by defendant Equitable & Central Trust Company, as trustee, for foreclosure of a second mortgage and assignment of rents and profits. Union Guardian Trust Company and others, note holders' protective committee, and White Star Refining Company and others intervened. From decree granting strict foreclosure, cross-plaintiff and interveners appeal. Modified and affirmed.

*Dykema, Jones & Wheat,* for plaintiff trust company.

*Stevenson, Butzel, Eaman & Long (Charles A. Wagner,* of counsel), for defendant Equitable & Central Trust Company.

*John M. Chase,* for interveners Union Guardian Trust Company and others.

*Harold R. Martin,* for interveners White Star Refining Company and others.

BUTZEL, J. In 1927, the Detroit City Service Company was incorporated under the laws of this State for the purpose of continuing the ice and fuel business formerly carried on by the General Necessities Corporation, whose plants, equipment, fixtures, good will, etc., it acquired. The General Necessities Corporation had manufactured and sold over 60 per cent. of the artificial ice purchased by the people of the city of Detroit and vicinity. It had owned a large number of plants at various points in or near

the city of Detroit, systematically located so that, with the use of horses and wagons or motor trucks, all consumers could be conveniently served from a neighboring plant. During the winter time a large portion of the transportation equipment had been employed in the fuel business. The plants were so coordinated that they constituted one large business, conducted principally from a single accounting and management office.

Owing to financial difficulties, the General Necessities Corporation threatened to default on $3,000,000 in bonds and $1,000,000 in notes, which had been underwritten and sold to the public through the assistance of Hoagland, Allum & Company and other investment bankers. In order to avert this default, the bankers formed the Detroit City Service Company, referred to herein as the "service company," which acquired the plants, machinery, fixtures, and other equipment of the General Necessities Corporation used in the ice and fuel business, as well as some real estate. At the same time the bankers organized the Detroit City Service Realty Company, which took over the larger part of the real estate of the General Necessities Corporation, unemployed in its business. The realty company also acquired two plants, which it rented to the service company. The realty company is not involved in the present litigation.

The General Necessities Corporation was the owner of all of the property it turned over to the service company, with the exception of a cold-storage plant which was being purchased on land contract, and on which there was still $400,000, or thereabouts, due at the time of its acquisition by the service company. This contract was subsequently abandoned.

The capital stock of the service company consisted of 25,000 shares of preferred stock, valued at $100 a

share, and 200,000 shares of no par value stock. Sixteen thousand shares of the preferred stock and all of the no par stock were subscribed for and issued. All of the common stock, with the exception of the few qualifying shares taken in the name of the directors, was subscribed for by William K. Hoagland, of the firm of Hoagland, Allum & Company. He also subscribed as trustee for all of the preferred stock that was issued. Hoagland became a director and the treasurer of the company, and appears to have been closely identified with the company's affairs from its very inception.

The articles of association of the service company placed the following valuations upon the assets it acquired:

Land, buildings and improvements, after deducting $400,000 due on the land contract ................................$ 3,891,836
Machinery, equipment, delivery equipment, supplies, furniture and fixtures, etc. ...................................  2,135,364
Commodities and inventories ..........    300,000
Deferred discount on bonds, prepaid taxes and insurance, etc. .............    440,000
Investments in subsidiaries ............    500,000
Cash ..............................    100,000

In order to raise funds to purchase these assets and to continue the business, the service company executed a first and open end mortgage of $10,000,-000 to the Union Trust Company, as trustee, to secure $10,000,000 of first mortgage six and one-half per cent. gold bonds, $3,000,000 of which were issued at once. Seven million dollars of additional bonds might be issued from time to time under conditions set forth in the indenture, upon the acquisition of other properties and filing of supplemental mortgages contemporaneously therewith, so as to bring

the new properties under the lien of the original indenture. The mortgage was dated July 1, 1927, and is referred to herein as the first mortgage. It covered the real estate, machinery, tools, implements and appliances, supplies, good will, etc., of the service company. The personal property is not described in great detail in the mortgage, but there is an omnibus clause covering all of the company's property, both real, personal, and mixed, and also all such property that might be acquired thereafter.

There was expressly excluded from the lien of the mortgage the accounts receivable, choses in action, inventory of merchandise, and capital stock of subsidiary or other corporations. As the inventory amounted to $300,000 at the time of the organization, it will be seen that the value of the unmortgaged property ran into a large figure. The mortgage also covered "tolls, rents, revenues, issues, income, product, and profits thereof." The mortgage further provided that the personal property and chattels conveyed or intended to be conveyed by or pursuant to the indenture should be real estate for all purposes of the indenture and held and deemed to be fixtures and appurtenances. They were not to be used or sold separately from the real estate except as otherwise provided in the instrument. The mortgage specifically permitted the sale of fixtures, equipment, machinery, apparatus, appliances, tools, implements, and delivery equipment that were worn out or unserviceable, antiquated, or unnecessary in the conduct of the business, but upon such sale they were to be replaced in due course with new fixtures, etc., which should forthwith become subject to the lien of the indenture.

The mortgage provided that, in the event of default, the trustee should be entitled to the possession of the mortgaged property and also to the rents, in-

come, issues, and profits, after giving the notice required by Act No. 228, Pub. Acts 1925 (3 Comp. Laws 1929, §§ 13498, 13499). It was further provided that, upon the occurrence of one or more events of default and the filing of a bill in equity or the commencement of other judicial proceedings, the trustee should be entitled, as, a matter of right, to the appointment of a receiver or receivers of the mortgaged and pledged properties, and of the rents, income, issues, and profits thereof pending such proceedings, with such powers as the court making such appointment should confer.

The mortgage was duly executed and recorded as a real estate mortgage. It never has been filed as a chattel mortgage, though it contains a duly-executed affidavit, showing adequacy of security, etc., in the form required for the recording of chattel mortgages (3 Comp. Laws 1929, § 13424). The mortgage bears a certificate of the county treasurer showing that a $15,000 mortgage tax was paid in accordance with 1 Comp. Laws 1929, § 3642.

In January, 1928, the service company, in order to acquire the properties of the National Ice Company and the Detroit Consumers Company, issued $1,300,-000 of first mortgage bonds under the $10,000,000 open end mortgage hereinbefore described. In October, 1928, an additional $260,000 in first mortgage bonds were issued to pay in part for the acquisition of properties of the Gaukler Ice & Fuel Company of Pontiac, Michigan. In both instances, supplemental mortgages were duly executed and properly recorded as real estate mortgages.

In addition to the first mortgage of $10,000,000, the company on its organization issued $1,250,000 of five-year six and one-half per cent. gold notes, dated July 1, 1927, and .a year later, $700,000 of six and one-half per cent. gold notes, payable in four years.

Both note issues were secured by indentures running to the Union Trust Company, trustee.

On January 1, 1930, the company executed a second mortgage to the Guaranty Trust Company, as trustee, to secure $500,000 of bonds issued thereunder. The mortgage was recorded as a real estate mortgage and also properly filed as a chattel mortgage. It recites that it is junior, subject, subordinate, and subservient to the liens, etc., of the first mortgage, which it describes as being a mortgage on both the real and personal property.

The Detroit Trust Company became the successor-trustee to the Union Trust Company under the first mortgage and supplements thereto. The Equitable & Central Trust Company succeeded the Guaranty Trust Company as trustee under the second mortgage, and the Union Guardian Trust Company is the present trustee under the gold note indentures.

The service company was unable to meet its obligations. On January 16, 1931, the Detroit Insurance Agency filed a bill of complaint against the service company as a general creditor, alleging the latter's inability to meet the current requirements of its funded indebtedness. The bill alleged further that the service company was burdened with real estate which could not be disposed of on account of market conditions, and that it could not meet its many obligations. The plaintiff sought the appointment of a receiver. The service company, in its answer, admitted the allegations, and on January 16, 1931, the Union Guardian Trust Company and H. S. Oderman were appointed receivers, with power to continue, manage, operate, and conduct the business of the company. The order enjoined creditors from instituting suits or levying executions. On May 25, 1931, an order was entered requiring all creditors to file

claims with the receivers on or before September 14, 1931.

On June 25, 1931, the Consolidated Public Service Company, a corporation in which Hoagland and Allum held an interest, filed a petition to intervene. It alleged ownership of a majority of the common stock of the service company, set forth the past and present financial status of the service company, and asked for the appointment of a receiver. It prayed that the assets be marshaled and liquidated and the business wound up. The service company immediately filed an answer, in which it admitted the allegations of the petition of intervention, and prayed for the appointment of a receiver or a continuance of the receivership already existing. A new order was entered appointing the same receivers.

On June 27, 1931, the Detroit Trust Company, successor to the Union Trust Company as trustee under the first mortgage, instituted an independent suit asking for the foreclosure of the first mortgage and for the sale of all of the properties, except the accounts receivable, choses in action, inventory of merchandise, and capital stock of subsidiaries, all property excluded from the lien of the first mortgage. On the same date, the Detroit Trust Company served notice on the service company and the receiver declaring the principal of the first mortgage gold bonds due, together with all unpaid accrued interest, and demanding payment of all rents, income, issues, and profits of the mortgaged property and trust estates in accordance with Act No. 228, Pub. Acts 1925 (3 Comp. Laws 1929, §§ 13498, 13499). This notice was filed with the register of deeds for Wayne county, Michigan, on June 29, 1931. On July 3, 1931, the Detroit Trust Company, as trustee, filed a petition setting forth the equity receivership, praying for a consolidation of the two cases, and consenting that

the same receivers be appointed for the consolidated cases. An order was entered in accordance with the petition.

On July 10, 1931, the Detroit Trust Company, trustee, filed an amended bill, alleging that the ice and coal business of the company was of such a nature that it would sustain serious loss if the operations were even temporarily suspended; that the value of the assets depended upon the continuous operation of the company as a going concern; that the ice machinery was of such a nature that idleness would cause rapid depreciation; and that the company was a *quasi*-public utility. In addition to the relief prayed for in the preceding bill, it asked that all of the property of the service company, including its business and good will, be sold as a unit and as an operating and going concern. This bill joined the Guaranty Trust Company of Detroit, trustee under the second mortgage, as a party defendant. In accordance with another petition filed by the Detroit Trust Company, as trustee, an order was entered segregating and sequestering all of the tolls, earnings, revenues, rents, issues, profits, and income of the mortgaged property, together with all earnings prior and subsequent to the date of the order.

On October 24, 1931, the Equitable & Central Trust Company, as successor to the Guaranty Trust Company, trustee under the second mortgage, filed an answer and cross-bill. It admitted that the second mortgage was junior, subservient, and subordinate to the lien of the first mortgage, but denied that the Detroit Trust Company, as trustee under the first mortgage, was entitled to any lien on the personal property because of the failure to file the mortgage as a chattel mortgage. It further denied the right of the trustee to the rents, income, issues, and profits of the mortgaged property, because the mortgage and

its supplements contained no specific assignment of rents and profits, and because the rents, issues, and profits constituted merely a part of the mortgaged property, to which one claiming under the mortgage would not be entitled unless and until an absolute title vested following a foreclosure sale. It further denied that the Detroit City Service Company was a *quasi*-public utility, or that its property could be sold as a unit and as an operating concern under the first mortgage trustee's bill, because all of the property was not covered by the first mortgage, and because an equity of redemption is allowed under the laws of the State of Michigan. The cross-bill prayed for a foreclosure of the general mortgage. No testimony was taken on the cross-bill.

It is unnecessary to set forth the further proceedings in the cause, except as hereinafter referred to. Questions involving the rights and priorities of the first and second mortgagees, the Detroit Insurance Company *et al.*, the first plaintiffs in the equity suit, the White Star Refining Company *et al.*, intervening creditors, and the Union Guardian Trust Company, trustee, *et al.*, representing the note holders, are the principal issues in the case. Other pleadings will only be briefly referred to in discussing the various questions that are presented for review.

After a hearing at which the claims of all parties were fully presented, the trial judge entered a decree holding that all of the personal property, with the exception of the book accounts, inventory of merchandise, choses in action, and stocks in subsidiaries was subject to the first mortgage; that all the properties employed in the business constituted one plant or unit; that the company was a *quasi*-public corporation; that, under the assignment of rents and profits clause, the Detroit Trust Company, as trustee

for the first mortgage bondholders, was entitled to all of the rents and profits, including the earnings realized by the receivers as a result of their operation of the plants and conduct of the business; that the Detroit Trust Company, as plaintiff, was entitled to a foreclosure of the mortgage and a sale of the property without equity of redemption, referred to as strict foreclosure; that all the plants used solely in the ice and fuel business should be sold as a unit, and all the property not so used should be sold separately; that the cost of preparation of an audit, as ordered by the Detroit Trust Company, trustee, should only be allowed as a general claim; and that, on the foreclosure sale, first mortgage bonds and coupons appertaining thereto should be accepted, provided sufficient cash to meet certain expenses and costs were first paid. We shall discuss only those questions that have been raised on appeal or on suggestion of the court. All other questions will be considered as settled by the decree.

*Character of mortgaged property.* The question is first raised as to what property of the corporation constituted fixtures and came under the lien of the mortgage, if regarded solely as a real estate mortgage due to the failure to file as a chattel mortgage. There is no question but that the land and buildings would come thereunder. We need not consider the stock on hand, book accounts, choses in action and stocks in subsidiary corporations, all of which the mortgage expressly excludes by its very terms. The ammonia compressors, aerating equipment, boilers, motors and refrigerating units, freezing tanks, air compressors, condensers, engines, oil tanks and pumps, platform scales, scorching machines, and other machinery for manufacturing ice are fixtures. See *Dehring* v. *Beck,* 146 Mich. 706; *Lyle* v. *Palmer,*

42 Mich. 314; *Tyler* v. *Hayward,* 235 Mich. 674; *Peninsular Stove Co.* v. *Young,* 247 Mich. 580; *Kent Storage Co.* v. *Grand Rapids Lumber Co.,* 239 Mich. 161; *First Mortgage Bond Co.* v. *London,* 259 Mich. 688. We believe that this should also include spare motors, parts, machinery, equipment, etc., which constitute replacements specially adapted to the full enjoyment of the realty. See *Voorhis* v. *Freeman,* 2 Watts & Sergeant's Rep. (Pa.) 116.

In addition to the foregoing, however, there were horses, wagons, motor trucks, automobiles, office furniture, typewriters, adding machines, and other movable personal property, including portable ice storage houses which were moved from place to place. The latter were small sheds, somewhat smaller than voting booths, which were placed on property belonging to the company or leased from others, and from time to time filled with ice, as required, which was sold by employees placed in charge of these stations. They were set on the ground without any foundation and without any thought of permanency. In distinguishing between what is a fixture and what a chattel, when neither is annexed to the freehold, the use, nature, and intention of the parties must be considered. A carpet nailed to the floor of a house is a chattel, while a key to the house carried in one's vest pocket is a fixture. *Goodin* v. *Elleardsville Hall Ass'n,* 5 Mo. App. 289.

The intention of the parties in the instant case is evident. While it may be claimed that the attaching of the affidavit of adequacy, etc., to comply with 3 Comp. Laws 1929, § 13424, may not be conclusive as to the character of a large part of the movable property, the testimony shows beyond any question that the parties did not regard such property as fixtures. The mortgage was executed almost contemporaneously with the incorporation of the service company,

at a time when the officers of the company must have had in mind the character of the property and then purposely withheld the instrument from filing as a chattel mortgage so as not to impair the credit of the company.

Horses, wagons, trucks, automobiles, office furniture and equipment, and other movable property are of such a character that they can be transported from place to place without impairing their value, or that of the realty from which they are removed. The nature of a larger part of this property was such that it would be extremely difficult by any stretch of the imagination to classify such subjects as "fixtures." In coming to our conclusions, we need not consider the provision in the first mortgage declaring all of the personal property to be fixtures, inasmuch as the dispute arises solely between the service company and creditors other than the holders of bonds issued under the first mortgage. As to such creditors, we find all of the property not hereinbefore designated as fixtures to be chattels.

Our attention has been directed to a few cases in other jurisdictions holding otherwise. In *Bon Air Planting Co.* v. *Barringer,* 142 La. 60 (76 So. 234), the court went so far as to say that, under the Louisiana Code, 23 mules belonging to a sugar plantation formed part of the plantation and were fixtures, that the mules were "immovable by destination." We are not in accord with this view. In *Scudder* v. *Anderson,* 54 Mich. 122, the court said:

"We can conceive of no circumstances under which chairs, tables, movable desks, stoves, tools and ordinary vehicles could be classed as fixtures at all, and counsel disclaim any such idea. It would be possible for pipes, large bellows and perhaps fixed scales to be so treated if attached in such a manner

as to form part of the fixed property. But movable pipes, or anything else, which are in fact moved from time to time, and used for different purposes and in different places, could hardly be so considered.''

See, also, *Robertson* v. *Corsett,* 39 Mich. 777; *Wheeler* v. *Bedell,* 40 Mich. 693; *Burrill* v. *Wilcox Lumber Co.,* 65 Mich. 571; *Morris* v. *Alexander,* 208 Mich. 387, where garage appliances and tools were held to be chattels; *Union Trust Co.* v. *Marsh,* 255 Mich. 147, where linotype machines were held to be chattels. We believe that the movable personalty not hereinbefore designated as fixtures should be regarded as chattels. We shall not discuss the question any further, however, in view of our conclusions as to priorities.

*Construction of 3 Comp. Laws 1929, § 13424.* Although the first mortgage or deed of trust was duly executed, both as a real estate and chattel mortgage, and was represented to be a first lien on the property, it nevertheless was recorded only as a real estate mortgage. The secretary of the corporation, an attorney who represented the bankers and the trustee as well, expressly withheld the mortgage from record as a chattel mortgage under instructions from the bankers, in order to avoid an impairment of the credit of the company. The testimony indicates their belief that the real estate security was more than ample. The bondholders were in no way to blame for this failure on the part of the trustee to file the instrument as a chattel mortgage, and they had every reason to believe that the mortgage was a first mortgage on the personal property described therein. The trustee was absolved of the duty of looking after the recording or filing of the instrument by the terms of the mortgage. The question of the liability of the trust company for failure

to file the mortgage is not before us and need not now be considered.

We are confronted with this question: Did the failure to file the first mortgage with the proper authorities as a chattel mortgage make it void as to subsequent creditors who extended credit with notice? The law of Michigan has been in a state of confusion. The statute, 3 Comp. Laws 1929, § 13424, recites that failure to file a chattel mortgage shall make it "absolutely void as against the creditors of the mortgagor, and as against subsequent purchasers or mortgagees in good faith," unless accompanied by immediate delivery followed by an actual and continued change of possession of the property mortgaged. The quoted words appear in their present form in section 10 of chapter 81 of the Revised Statutes of 1846. The chapter heading: "Of fraudulent conveyances and contracts relative to goods, chattels and things in action," indicates its purpose. Although the statute has been amended from time to time during the course of years, the phrase quoted remains unchanged, notwithstanding the fact that at times a construction has been placed upon the meaning of the statute different from that which a literal interpretation of the words might indicate.

The query eventually arose as to whether the unfiled mortgage was valid as to subsequent creditors with notice. The early case of *Cooper* v. *Brock,* 41 Mich. 488, held that such a mortgage was absolutely void, and that nothing short of a change of possession or filing, as the section required, could save it. In this case, however, the question of notice was not raised. A number of years later, the court, moved by more equitable considerations and an analysis of the purposes of the statute and the mischief it sought to overcome, followed the construction placed

on similar statutes in some other States, reversed the ruling in *Cooper* v. *Brock, supra,* and held that the mortgage was void only as to subsequent creditors without notice. See *Charles Root & Co.* v. *Harl,* 62 Mich. 420; *Brown* v. *Brabb,* 67 Mich. 17 (11 Am. St. Rep. 549); *Cutler* v. *Steele,* 85 Mich. 627; *First National Bank* v. *Guntermann,* 94 Mich. 125; *Littauer* v. *Houck,* 92 Mich. 162 (31 Am. St. Rep. 572); *Baker* v. *Parkhurst,* 119 Mich. 542; *Loeser* v. *Jorgenson,* 137 Mich. 220; *Heenan* v. *Forest City Paint & Varnish Co.,* 138 Mich. 548; *Sachs* v. *Norn,* 139 Mich. 357.

This latter construction of the law, however, was reversed in *People, for use of Esper,* v. *Burns,* 161 Mich. 169 (137 Am. St. Rep. 466), which definitely held that failure to file a chattel mortgage without a change of possession, etc., as provided by the statute, made it void as to all creditors. This case was followed and approved in *City Bank & Trust Co.* v. *Hurd,* 179 Mich. 454, but with some qualification, for the court said:

"In certain cases under the circumstances there shown, knowledge has been held to be of controlling importance and equivalent to recording.    *    *    * The latest treatment of, and rulings by this court upon the subject is *People, for use of Esper,* v. *Burns,* 161 Mich. 169 (137 Am. St. Rep. 466), where it is held settled in this State that actual notice by a creditor of the existence of an unrecorded mortgage is not inevitably a sufficient substitute (to give it priority) for recording the same."

In *City Bank & Trust Co.* v. *Hurd, supra,* Hurd was an employee of the mortgagor, and although he denied knowledge of the fact that the unfiled mortgage covered after-acquired property, the court found that, even if he had such knowledge, the mort-

gage would be void as to him, due to the mortgagee's failure to file the instrument. Were it not for subsequent decisions of the Federal courts and our court, we would be bound by the rule laid down in *People, for use of Esper,* v. *Burns, supra,* and the rule would be productive of very inequitable results in the instant case. The rule of *stare decisis* generally determines, even though equitable considerations might prompt a different result.

Shortly after the decision in *People, for use of Esper,* v. *Burns, supra,* the United States Circuit Court of Appeals (6th Circuit) in *Re Huxoll,* 113 C. C. A. 637 (193 Fed. 851), held, in an opinion written by Judge Knappen, that:

"The words 'creditors of the mortgagor' are construed by the Supreme Court of Michigan to mean subsequent creditors in good faith and without notice of the mortgage. *Fearey* v. *Cummings,* 41 Mich. 376; *Charles Root & Co.* v. *Harl,* 62 Mich. 420; *Buhl Iron Works* v. *Teuton,* 67 Mich. 623; *Cutler* v. *Steele,* 85 Mich. 627; *First Natl. Bank* v. *Guntermann,* 94 Mich. 125, 126; *Baker* v. *Parkhurst,* 119 Mich. 542."

The learned judge did not overlook *People, for use of Esper,* v. *Burns, supra,* but referred to it in connection with another issue.

*In re Huxoll, supra,* was followed by *Detroit Trust Co.* v. *Pontiac Savings Bank,* 115 C. C. A. 631 (196 Fed. 29), shortly thereafter, and the court, in another opinion written by Judge Knappen, adopted the principle laid down in *Re Huxoll, supra,* and again stated that the words "creditors of the mortgagor" applied only to subsequent creditors in good faith and without notice of the mortgage. *Detroit Trust Co.* v. *Pontiac Savings Bank, supra,* was reviewed and affirmed in 237 U. S. 186 (35 Sup. Ct.

509), where the language limiting the operation of the statute to subsequent creditors without notice was quoted once more. Notwithstanding the profound respect we have for the opinions of the United States Supreme Court, we are not bound thereby in the construction of a Michigan statute. However, in *Peter Schuttler Co.* v. *Gunther,* 222 Mich. 430, we approved of the opinion of the United States Supreme Court, and quoted the excerpt therein relating to the application of the statute.

Counsel on both sides in the instant case criticize the various decisions cited insofar as they affect their claims adversely. They contend that the statements of the courts in these cases have been pure *dicta,* and unnecessary to a settlement of the issues involved. We shall not discuss these contentions. This court has adopted the rule laid down by the Supreme Court of the United States, as set forth but recently by our court, and holds that the statute protects only subsequent creditors without notice. Support for this rule may be found in decisions in some other jurisdictions. See *Dyer* v. *Thorstad,* 35 Minn. 534 (29 N. W. 345); *J. B. Kern & Son* v. *Wilson,* 82 Iowa, 407 (48 N. W. 919); *In re Ducker,* 133 Fed. 771; *Gill* v. *Griffith,* 2 Md. Ch. 270; *Tucker* v. *Tilton,* 55 N. H. 223.

*Notice given by second mortgage.* The Equitable & Central Trust Company, as successor of the Guaranty Trust Company, trustee under the second mortgage, has waived its rights to security under the second mortgage, and claims only those of a general creditor. The second mortgage, which was filed as a chattel mortgage, referred to the first mortgage to which it was subject, described it as covering both real and personal property, and gave the date of its execution and recording in the register of deeds' office, including the liber and page of the record.

While the trustee under the second mortgage may have believed it to its advantage to claim only as a general creditor and thus to attempt to avoid the first mortgage because it was not filed, nevertheless it still cannot avoid the notice of the first mortgage given in the second mortgage, nor can the unsecured creditors, all of whom appear to have extended credit after the second mortgage was properly filed.

While it is true that the recording of a real estate mortgage does not give notice of its chattel mortgage provisions (*Security Trust Co.* v. *Tuller,* 243 Mich. 570, 574), the filing or recording of a later mortgage in the proper office where the prior mortgage should have been filed or recorded does give constructive notice of the prior instrument, if specific reference to it is made therein. In *Fruth* v. *Bolt,* 39 S. D. 351 (164 N. W. 105), it was held:

"The reference contained in this mortgage to the first mortgage was sufficient to put a prudent person upon inquiry, and, had such inquiry been pursued with a reasonable degree of diligence, it would have been learned that the first mortgage debt had not been paid."

See *Taylor* v. *Mitchell,* 58 Kan. 194 (48 Pac. 859); *Ebling Brewing Co.* v. *Gennaro,* 189 App. Div. 782 (179 N. Y. Supp. 384). One may be held to notice, under these circumstances, not only of the existence of an unrecorded mortgage, but also of the provisions contained therein. *Guerin* v. *Sunburst Oil & Gas Co.,* 68 Mont. 365 (218 Pac. 949); *J. R. Crowe Coal & Mining Co.* v. *Atkinson,* 85 Kan. 357 (116 Pac. 499, Ann. Cas. 1912 D, 1196); *McPherson* v. *Rollins,* 107 N. Y. 316, 332 (14 N. E. 411, 1 Am. St. Rep. 826). That recording constitutes constructive notice, not only of the existence, but also of the contents of a

recorded instrument, was held by this court in *Lines v. Weaver*, 220 Mich. 244, where we declared:

"The contract and deed were of record and were constructive notice to Burrusch of all they contained. We must assume, therefore, that Burrusch had knowledge of whatever the papers contained."

Inasmuch as it is conceded that the lien of the first mortgage will result in an exhaustion of all the mortgaged assets of the service company, a determination of the relative rights and priorities of the second mortgagees over the general creditors, after the first mortgage has been satisfied, is unnecessary to the decision.

*Negotiability of notes.* The first series of notes, aggregating $1,250,000, was issued contemporaneously with the mortgage. The entire issue was purchased by the investment bankers, who also purchased $3,000,000 of the first mortgage bonds, as well as stock in the company. They had notice through full and complete knowledge of the chattel mortgage provisions of the first mortgage. One of these bankers not only was a director and treasurer of the service company, but was largely instrumental in keeping the indenture from being filed as a chattel mortgage.

The trial judge also held that the testimony conclusively showed that the Consolidated Service Company purchased the second note issue of $700,000 with notice of the chattel provisions of the first mortgage. The latter company clearly had notice of the mortgage through its affiliate, the Consolidated Public Service Company. The Consolidated Public Service Company furnished the manager and president of the Detroit City Service Company, but his salary was charged to Hoagland, Allum & Company. The minutes of the Detroit City Service Com-

pany refer to Messrs. Hoagland and Allum of the Consolidated Service Company. They further show that the Consolidated Public Service Company and the Consolidated Service Company were affiliated. The Detroit City Service Company was instructed to close the two accounts into one and the correspondence to the two companies went to one office. The trial judge properly found that to hold that the Consolidated Service Company did not have full knowledge of the affairs of the Detroit City Service Company would be doing violence to reason. Hoagland and Allum, who had full knowledge of the first mortgage covering chattels and real estate, were associated with both companies. There was no testimony whatever to rebut the almost conclusive showing that the two companies were closely united. It seems incredible that the Consolidated Service Company, with which Messrs. Hoagland and Allum were associated purchased $700,000 of notes of the Detroit City Service Company without the knowledge possessed by its parent and affiliated company, the Consolidated Public Service Company.

The query arises, then, whether the present holders of the two issues of notes which were originally purchased respectively by Hoagland, Allum & Company in association with other investment bankers, and by the Consolidated Service Company, with full knowledge of the chattel provisions of the unfiled first mortgage, are charged with the notice that the original purchasers had. They must be so charged if the notes are nonnegotiable. Each note contained the following clause:

"This note is one of a duly authorized issue of notes * * * issued under and all equally entitled to the benefit of a trust agreement * * * executed by the company to Union Trust Company, of Detroit, Michigan, as trustee. * * * For a descrip-

tion of the rights of the holders of the notes and the terms and conditions upon which the notes are issued, reference is made to the said trust agreement with like effect as though said trust agreement were recited in full herein.''

This language differs from that in the debentures which were held to be negotiable in *Paepcke* v. *Paine,* 253 Mich. 636 (75 A. L. R. 1205), and *Merchants National Bank* v. *Detroit Trust Co.,* 258 Mich. 526, in that the instruments in those cases contained no specific direction that the trust indentures be completely incorporated therein, with like effect as though recited in full in the notes. As was stated in *Fidelity & Deposit Co.* v. *Andrews,* 244 Mich. 159:

''The mere fact that the bonds were secured by the deed did not change their character or affect their negotiability   *   *   *   They are deprived of negotiability because the deed is expressly made part of them. It is as though its contents were repeated in them.''

The opinion referred to *King Cattle Co.* v. *Joseph,* 158 Minn. 481 (198 N. W. 798), wherein the words ''and hereby reference is made to said indenture and the same made a part hereof, with the same effect as if herein fully set forth,'' rendered the instrument nonnegotiable.

In *Paepcke* v. *Paine, supra,* the bonds referred to the instrument securing them solely for the purpose of describing the security. In the instant case, however, the language of the notes necessitates that the trust indenture be regarded as if it were incorporated into and were a part of the notes. Reference to an extrinsic instrument is necessary to determine the nature of the promise. The notes do not contain an unconditional promise to pay, and are nonnegotiable.

*Rents and profits.* The first mortgage contained no clause specifically assigning the rents and profits in the exact language of the statute. After a description of the mortgaged property, there followed the words:

"Together with all  *  *  *  tolls, rents, revenues, issues, income, product, and profits thereof."

Article 10 of the mortgage indenture, entitled: "Remedies of trustees and bondholders upon default," provided for a surrender to the trustee, upon default, of possession of all mortgaged property, etc., and states that it shall be lawful for the trustee "to receive the rents, income, issues and profits thereof, after notice given as required by Act No. 228, Pub. Acts 1925" (3 Comp. Laws 1929, §§ 13498, 13499). We believe that this was sufficient to assign the rents and profits as additional security in the event of default. The trustee complied with the first section of the act.

Section 2 of the act (3 Comp. Laws 1929, § 13499) makes the assignment of rents good and valid against the mortgagor or mortgagors or those claiming under or through them from the date of the recording of the trust mortgage or deed of trust, but only makes it binding

"upon the occupiers of the premises from the date of the filing by the trustee or trustees in the office of the register of deeds for the county in which the property is located, of a notice of default in the terms and conditions of the trust mortgage or deed of trust and the service of a copy of such notice upon the occupiers of the mortgaged premises."

The trustee filed proper notice of default with the register of deeds and served a copy on the receivers. A small portion of the realty not used by the service company was rented to tenants, however, and they

were not served. We believe that service on the receivers, after the notice had been filed with the register of deeds, was sufficient. Service upon the occupiers of the premises is for their protection only, and, until receipt of such notice, it was proper for them to pay rent to the receivers. It was also proper for the trustee under the mortgage to serve notice on the receivers. The trustee is entitled to all rents from property leased to others and paid to the receivers, after service on them of a copy of the duly recorded assignment of rents under Act No. 228, Pub. Acts 1925 (3 Comp. Laws 1929, §§ 13498, 13499). This case is distinguishable from *Detroit Properties Corp.* v. *Detroit Hotel Co.*, 258 Mich. 156, 159, in which the receivers were also the "occupiers" and no notice of any kind was filed or served upon them.

The lower court, however, was in error in allowing the Detroit Trust Company, trustee, all of the profits made by the receivers through operation of the mortgaged premises and business. When relieved of the payment of interest and charges for depreciation, the operations of the receivers show a large profit. This was realized, however, partly through the use of inventory, receivables, and other elements that were unmortgaged, in combination with labor and management. We do not believe that the word "profits" as used in Act No. 228, *supra,* can be construed to cover business profits made by the receivers through possession and operation of the mortgaged property in the instant case. Under the common law, the word "profits" when used in connection with rents, meant the usufruct of the land. *Hazeltine* v. *Granger,* 44 Mich. 503. As defined by 3 Bouvier (Rawle's 3d Rev.), p. 2737:

"Under the term profit is comprehended the produce of the soil, whether it arise above or below the surface; as herbage, wood, turf, coals, minerals, stones; * * * also fish in a pond or running water."

In *Hitchcock* v. *Pratt,* 51 Mich. 263, the court implied that the phrase "rents and profits" did not include business profits. The question has seldom arisen, and no certain rules can be laid down based on decisions in other jurisdictions, particularly in view of the fact that, in Michigan, the principle that the mortgagee is not entitled to possession until after foreclosure and the expiration of the equity of redemption is applied more strictly than in many other jurisdictions. We do not believe that the word "profits" as used in Act No. 228, *supra,* means business profits arising out of the operation of mortgaged premises not rented to others but occupied and used by the mortgagor.

Act No. 228 is described in *Security Trust Co.* v. *Sloman,* 252 Mich. 266, as not perfectly drafted. The title refers to "rents and profits of property." Section 1 states that it shall be lawful to assign the rents and profits of the property mortgaged under a trust mortgage. Section 2, however, states that the assignment of rents and profits, when certain formalities are carried out, "shall be a good and valid assignment of rents." The omission of the words "and profits" after the phrase "good and valid assignment of rents" may have been due to an oversight. Appellants claim that the entire statute should be read together. We do not believe, however, that the statute was meant to include, under any circumstances, all profits made through the use of mortgaged buildings, fixtures, and chattels in combination with unmortgaged inventory, receiv-

ables, etc., all employed in a manufacturing and distributing business. The query is pertinently made as to what the result should have been had the business been operated by the receivers at a loss.

Act No. 228 gives the mortgagee an additional remedy or security not allowed under the common law, and in construing it the strict policy of our court in protecting the mortgagor must be kept in mind. The mortgagee may not divest the mortgagor of possession of the mortgaged premises until after the title shall become absolute upon foreclosure of the mortgage. *Wagar* v. *Stone,* 36 Mich. 364; *Hazeltine* v. *Granger, supra; Nusbaum* v. *Shapero,* 249 Mich. 252; *Union Trust Co.* v. *Charlotte General Electric Co.,* 152 Mich. 568; *Union Guardian Trust Co.* v. *Rau,* 255 Mich. 324; *White* v. *Fulton,* 260 Mich. 346. This principle has been upheld repeatedly, even notwithstanding a provision in the mortgage providing for the appointment of a receiver upon default. *Union Guardian Trust Co.* v. *Rau, supra.*

*Distribution of dividends.* In addition to the proceeds from the sale of the unmortgaged assets, a large sum of money accumulated by the receivers through operation of the business will be available for payment as dividends to all creditors. The trustee under the first mortgage may prove its claim with interest up to the date for filing claims by general creditors, and may participate in dividends paid to unsecured creditors, without any deduction on account of its security. This is in accordance with the English chancery rule which has been adopted by this court. See *In re E. Bement's Sons,* 150 Mich. 530, where the rule is stated as follows:

"The debtor may now receive out of the general assets no more than his proportional share. Until the debt is paid, in full, principal and interest, the

creditor is entitled to such dividends as may be declared upon the total of the debt as proved. It is entirely immaterial to the receiver in what manner proceeds of collateral are applied, to the point when the sum of the dividends and of collateral collected has extinguished the entire debt, principal and interest.''

See, also, *Third National Bank of Detroit* v. *Haug,* 82 Mich. 607 (11 L. R. A. 327); *High* v. *Fifth National Bank of Grand Rapids,* 97 Mich. 502 (21 L. R. A. 822); *Merrill* v. *National Bank of Jacksonville,* 173 U. S. 131 (19 Sup. Ct. 360).

Appellants contend that we should follow the so-called bankruptcy rule instead, and only allow the first mortgage trustee the right to a pro rata participation in the fund for distribution to general creditors to the extent of the deficiency after application of the proceeds realized from the security. We find no reason to depart from the chancery rule that has been the law of this State.

There seems to be but little likelihood that the first mortgage creditors will realize a sufficient sum, from their share of the dividends to be paid to general creditors and from the proceeds of the foreclosure sale, to cover the amount due under the first mortgage. Should there be any surplus, however, after payment of the amount due on the first mortgage, plus interest up to the date of payment, such surplus shall be pro. rated among the general creditors, exclusive of those claiming under the first mortgage.

*Strict foreclosure.* The trial court should not have ordered a foreclosure sale, by which an absolute title was to be given to the purchaser, without allowing the mortgagor a right of redemption and possession of the mortgaged property during the period fixed

by statute. This is often called strict foreclosure. It is true, as appellee contends, that strict foreclosure has been allowed in the case of railroad mortgages in this State, but this is by virtue of an exception made by statute. 2 Comp. Laws 1929, § 11150. As was stated in *Ten Eyck* v. *Railroad Co.*, 114 Mich. 494, this special provision "operates to except railroad mortgages from the general statute relating to the foreclosure of real-estate mortgages." Even if a different rule should apply to *quasi*-public utilities, as is claimed by appellee, it has been definitely held that a company operating an ice manufacturing and supply business in a large community is not included in this category. *New State Ice Co.* v. *Liebmann*, 285 U. S. 262 (52 Sup. Ct. 371).

Strict foreclosure was allowed in *National Bank of Commerce* v. *Corliss*, 217 Mich. 435, and an insolvent creamery company's property was sold without equity of redemption. The case did not involve the foreclosure of a mortgage but of a land contract. There is no statutory right to redeem on foreclosure of a land contract. *Drysdale* v. *P. J. Christy Land Co.*, 248 Mich. 184; *Heppner* v. *Smith*, 238 Mich. 245, 247. Likewise, in *Webber* v. *Genesee Circuit Judge*, 184 Mich. 112, the court ordered sale of an electric light company plant by a receiver, who had been appointed in foreclosure proceedings on a showing that the plant was being run at a large loss. The receiver also was unable to conduct the business at a profit. The bill was filed for the purpose of protecting the security, restraining waste, and foreclosing the mortgage. Loss of the franchise to furnish electricity to the city of Fenton was threatened if the company shut down its plant. The court permitted the sale after some hesitation, but stated that if a proposed offer of a third party to lease the prop-

erty were accepted, and secured by a proper guaranty bond approved by the trial judge in order to avert further losses, no sale should be ordered. In the instant case, the business is being continued without interruption, the property and good will preserved, taxes and insurance premiums paid, and a profit is being realized by the receiver. The right to redeem from a foreclosure sale is a statutory right that has been strictly protected except under the unusual circumstances arising in *Webber* v. *Genesee Circuit Judge, supra.* The right can neither be enlarged nor abridged by the courts. *Batty* v. *Snook,* 5 Mich. 231, 239; *Wood* v. *Button,* 205 Mich. 692, 703.

*Payment in bonds.* We find no merit in appellants' objections to the provisions in the decree permitting the use of first mortgage bonds and pertinent coupons towards payment for the mortgaged property on foreclosure sale, as provided in the mortgage. It would be inequitable to deny the right to use bonds, provided sufficient cash is deposited so as to make necessary cash payments for expenses of the foreclosure and *pro rata* distribution to nondepositors. The right to use bonds in this manner is well reasoned out in Tracy on Corporate Foreclosures, § 209.

*Expenses of audit and sale.* The expenses of the foreclosure sale should be met out of the proceeds of the sale. The expense of the audit should also be added to the amount due under the mortgage, while other expenses must be borne by the receivers. Under section 13 of article 4 of the indenture, the service company agreed to keep proper books of record and account, open to the inspection of the trustee at all times, and agreed that, upon the written request of the holders of not less than 25 per cent. of the principal amount of the bonds, the trustee would

have a right to have an accounting made at the expense of the corporation. Such an accounting was had at a total cost of $12,000. The trial judge refused to permit this expense to be added to the amount due under the mortgage, but permitted it to be filed as an unsecured claim. Inasmuch as the payment of such amount was a lawful charge provided for in the mortgage and did not have any tendency to make the transaction usurious, we cannot find any valid reason why it should not be included in the amount due under the mortgage.

*Sale as a unit.* No objection is made to the provisions in the decree ordering the sale of all of the plants as a unit, the vacant property to be sold in separate parcels. The business of the various plants, although situated in various sections of the city and surrounding suburbs, radiated from one central office. The plants were used and occupied by the service company in such a manner that, if they were sold separately, it would disrupt the business and bring a smaller price to the damage of both the mortgagor and the mortgagee. The mortgaged good will goes with the mortgaged property. 3 Comp. Laws 1929, § 14627, contemplates sales of real estate in separate parcels when no intervening causes change the nature of the parcels, or when they are distinct and independent in description, occupancy, and use. The plants and the garage property serving them are distinct neither in occupancy nor use, but together constitute one unit. See *Security Trust Co.* v. *Sloman, supra,* 270; *Grand River Avenue Christian Church* v. *Berkshire Life Ins. Co.,* 254 Mich. 480.

The decree also properly provides for the sale of the mortgaged personalty in conjunction with the property used in the business. This results in a rather anomalous situation in so far as the equity of

redemption is concerned. The real estate may be redeemed within six months following the foreclosure sale. There is no statutory right of redemption from the sale of chattel mortgage property, although this court may make such a provision in the exercise of its broad equity powers. In order that the receivers may have the benefit and use of such mortgaged property other than the real estate during the six months' period of redemption, and that the entire plant, good will, and chattels belonging to it may be redeemed as a unit, should the right of redemption be exercised, it is ordered that the right of redemption extend, therefore, to all the mortgaged property sold. The receivers shall, however, pay to the purchasers of the mortgaged property, for such period as the possession of the chattels is withheld from them, an amount to be determined by the trial judge to be a fair rental, plus an additional sum sufficient to cover the depreciation and loss of any mortgaged chattels so sold at the foreclosure sale.

*Sale of equity of redemption.* The court asked for briefs on the question of the sale of all of the assets by the receivers in their capacity as such under appointment in the equity case. The consolidation of the equity and foreclosure suits did not deprive the plaintiffs in each cause of their respective rights. As was said by Judge Taft in *Continental Trust Co.* v. *Railroad Co.,* 82 Fed. 642:

"Causes are consolidated only when they may proceed to judgment under one title without impeding or diminishing the remedial object and effect of the proceeding for each complainant."

It is apparent here that if all of the property could be sold at one time, so as to give to the purchasers of the business and the assets strictly belonging to it, an absolute title without delaying pos-

session during the six-months' period of redemption, it would be beneficial to all parties. The equity receivership, particularly in view of the allegations in the second bill of complaint, which were admitted in the answer of the service company, gave the receivers title to all the assets, subject to the liens. The lien created by the second mortgage, which is not being asserted, undoubtedly will be valueless after foreclosure sale under the first mortgage.

The appointment of receivers in the present case arose out of exceptional circumstances, as in *Edison* v. *Fleckenstein Pump Co.*, 249 Mich. 234, where an equity receivership was upheld. The large profit shown as a result of the operation of the receivers is less than the interest charges on the first mortgage. Depreciation and other charges have not been deducted. Upon reading the record and also considering business conditions, the depreciation of real estate values, curtailment of buying power, etc., it seems almost certain that the mortgaged property will not be sold at the foreclosure sale for the amount due on the first mortgage indebtedness. To delay possession during the six-months' period of redemption would tend to frighten away all bidders except first mortgage bondholders, and they would be apt to bid much less if reorganization is delayed.

If the equity of redemption is sold at once, the large expense of continuing the receivership can be eliminated. It has already been pending over two years. The policy of the courts has always been to bring a receivership to a close as quickly as it can be accomplished without injury to the creditors. The general creditors, however, cannot be deprived of the profits that may be made from the operation of the business during the six-months' period of redemption.

The trial court can determine the average profits made by the receivers during the months of 1931 and 1932 corresponding to the six months of the redemption period, and in this manner estimate with some fairness what the profit would be were the business continued by the receivers during the redemption period. From the profits so approximated, an amount should be estimated and deducted for the further expenses of the receivership and any other sums that must be paid from such profits before they become available for dividend purposes. The trial judge may also take into consideration any other facts that may raise or lower the probable profits. The net sum so approximated should be the minimum, or upset price, at which the equity of redemption should be sold immediately after the sale of the mortgaged property. If a bid is not received at least equal to such upset price, the sale of the equity should not be confirmed. If the equity of redemption is sold for at least the upset price, as so determined, then immediately thereafter all the other unmortgaged property shall be offered for sale. If the equity of redemption is not sold for at least the upset price, then the unmortgaged property should be sold at the expiration of the redemption period.

Bondholders bidding for the mortgaged property and/or the equity of redemption and/or the unmortgaged property may also tender their bonds towards payment of the amount bid, but, as to their bids for the equity of redemption and/or the unmortgaged property, only to the extent that the amount of the bonds held by such bondholders, or those making the bid in their behalf, shall bear to the entire proved indebtedness of the Detroit City Service Company. However, they may also, on proper application to the court, ascertain the approximate dividend to

which they will be entitled as creditors upon the distribution of the cash now in the hands of the receiver, and such additional sums available for dividends from the sale of the equity of redemption and the unmortgaged property, and they may apply such sums as would be paid as dividends on their claims towards the payment of any amounts bid at the sale of the mortgaged and/or unmortgaged properties. In bidding on the mortgaged property the bondholders shall pay sufficient in cash to pay the expenses of the sale and to insure that bondholders not bidding shall receive in cash a *pro rata* share of the amount bid.

In determining the amount of the dividends to be paid, a fair sum should be estimated and deducted for fees of the receiver, attorneys, and for all other lawful charges. These can be approximated, subject to final determination later. Further orders may be made so that the bondholders, in making their bid, may have the benefit of their proportion in the large amount of cash to be distributed to creditors. At all events, all necessary provisions shall be made to insure that such privileges as are conceded to bondholders will interfere in no way with an equitable cash distribution of the dividends to which other creditors and claimants are entitled. Any creditors, other than first mortgage bondholders, acting singly, or in groups, may also, upon application to the court, use such dividends to which they may be entitled in payment for any property offered for sale, on terms similar to those which have been allowed the first mortgage bondholders.

The decree of the lower court is affirmed as modified herein, with costs to appellants. The case is remanded to the trial court for the purpose of determining the respective amounts due, for the deter-

mination of the upset price to be bid for the equity of redemption, and for the entry of a decree in accordance with this opinion. The trial court may make such further provisions in the decree as are not inconsistent with this opinion, and also make other proper orders as may be necessary from time to time.

McDONALD, C. J., and CLARK, POTTER, SHARPE, NORTH, FEAD, and WIEST, JJ., concurred.