**In the Matter of Dwayne SUNBERG, Patricia Sunberg, Engaged in farming, Debtors.**

**Bankruptcy No. 83–540–W.**

United States Bankruptcy Court, S.D. Iowa.

May 16, 1983.

Dwayne Sunberg and Patricia Sunberg, in pro. per.

Charles R. Hannan, Council Bluffs, Iowa, for debtors.

Steven H. Krohn, Council Bluffs, Iowa, for PCA.

## MEMORANDUM OF DECISION AND ORDER

RICHARD STAGEMAN, Bankruptcy Judge.

On April 12, 1983, Dwayne and Patricia Sunberg ("Debtors") filed a voluntary petition in bankruptcy pursuant to Chapter 11 of the Bankruptcy Code of 1978.

On December 24, 1982, the stay imposed by the Supreme Court forestalling the effect of its decision in *Northern Pipeline Construction Co. v. Marathon Pipeline Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), expired leaving the bankruptcy court without jurisdiction.

On December 25, 1982, the Emergency Rule adopted by order of the District Court for the Southern District of Iowa became effective. This rule permits the bankruptcy court to continue to administer cases pursuant to Title 11 of the U.S.Code. The rule has been validated by the 8th Circuit. See, *In re Hansen,* 702 F.2d 728, 10 Bankr.Ct. Dec. 280 (8th Cir.1983). Based on the foregoing, the court finds that it has jurisdiction to enter a memorandum of decision and order in this matter.

On April 13, 1983, the Debtors filed an application to incur debt pursuant to 11 U.S.C. § 364. The purpose of the loan

sought by the Debtors is for operating expenses for their farming business in 1983.

On April 25, 1983, after receiving notice of the Debtors' application, the Agricultural Production Credit Association ("PCA"), objected to the Debtors' application to incur debt.

A notice of hearing was duly issued and the matter was set for hearing on April 23, 1983.

NOW, from the evidence adduced and from the written arguments submitted by the parties, the court makes the following:

## FINDINGS OF FACT

1. The Debtors have been farming in and around the Hamlin, Iowa, area since 1961. They farm approximately 895 acres, of which 495 acres are owned by the Debtors, and 400 acres are rented. The Debtors have planted corn and soybeans as their primary cash crops.

2. The Debtors also have adequate facilities to finish feeder pigs and cattle. They do not own any livestock currently.

3. The Debtors have been borrowing money regularly from the PCA since 1980. The Debtors currently owe the PCA a principal balance of $302,669.60 with interest to the date of filing of $149,823.90.

4. In order to obtain the initial loan from the PCA in 1980, the Debtors executed a security agreement giving the PCA a security interest in livestock, feed, grain on hand, farm machinery and equipment, and crops. In 1982, the PCA had the Debtors execute a new security agreement. This document gave the PCA a security interest in crops, growing crops, livestock, farm products, equipment, inventory, fixtures, contract rights, accounts and general intangibles existing or hereafter acquired. The PCA perfected its security interest with an amended financing statement filed on April 20, 1982.

5. The Debtors' financial position deteriorated further during the last half of 1982 and into 1983. The Debtors were unable to service most of their long term debt due to high overhead costs and poor commodity prices.

6. On January 11, 1983, John Block, Secretary of Agriculture, announced the details of a new program designed to reduce production, reduce government grain surpluses, and avoid increased budget outlays necessary for price support programs. The program will pay farmers in kind to take cropland out of production in 1983. The sign-up period ran from January 24, 1983, through March 11, 1983. The payment-in-kind program ("PIK") gives the farmer four options:

a. Participation in regular farm programs only.

b. Participation in regular farm programs plus the 10% to 30% PIK.

c. Participation in the PIK program by withdrawing an entire farm from production if a whole base acre bid is accepted.[1]

d. Not participate at all.

When the farmer signs up for PIK, a contract is signed which entitles the farmer to receive a certain number of bushels of the commodity that would have been produced on PIK acres based upon past production records. In return, the farmer agrees to not plant the diverted acres, use good soil conservation techniques, keep weeds under control, and where prudent and economical, plant a ground cover that cannot be grazed or harvested during the 6 month growing season. The farmer also agrees to abide by the terms and conditions set forth in the appendix that is attached to the contract. See Appendix to Form CCC–477.

7. At the end of the growing season, the operator will have 5 months to claim the PIK entitlements either from CCC stored corn on his property or from an elevator. Then, the operator is free to use the grain in any manner consistent with the individual operator's own financial situation. The

---

1. Base Acreage is defined as the total acres of cropland planted for harvest during the past 3 years in a certain crop.

PIK entitlement will be made out in the name of the producer or operator or the assignee of the producer or operator. See 7 CFR § 770.6(e); (f).

8. On January 12, 1983, the Agricultural Stabilization and Conservation Service ("ASCS") issued interim rules governing the PIK program. 48 Fed.Reg. 1477 (1983) (to be codified at 7 CFR § 770.1–.6). The rules describe how the program will operate, its purpose, the obligations of the operator and producer and the obligations of the U.S. Department of Agriculture ("USDA") and its administering agencies, the Commodity Credit Corporation ("CCC") and the ASCS. The rules were adopted in final form on March 4, 1983. 48 Fed.Reg. 9232 (1983) (to be codified at 7 CFR § 770.1–.6).

The rules of March 4, 1983, were amended in six different places to reflect public comments and other matters considered relevant by the USDA and the ASCS. The most significant amendments for purposes of this matter are found at 7 CFR § 770.6(e) which provides for the assignment of the PIK rights and § 770.6(f) which protects the USDA from becoming embroiled in disputes over the ownership rights of the entitlement after the terms and conditions of the contract are fulfilled.

9. On February 9, 1983, Dwayne Sunberg ("Debtor") signed an application form and contract indicating his intent to participate in the PIK program with crop share producer Billy Twist. The Debtor agreed to divert 57 acres in corn base acreage and take a payment in corn equal to 2212 bushels. (This amount equals a 50% share.) The CCC representative approved the contract on March 16, 1983.

10. On March 9, 1983, the Debtor agreed to divert other acres that he is farming. He executed two PIK contracts which, if complied with would divert 34.5 acres of rented land and 107 acres of land owned by the Debtors to non-crop use. Each of these parcels has a corn base acreage. The Debtor is to receive 9,940 bushels of corn for his efforts. These contracts were approved by the CCC on March 16, 1983.

11. The Debtors filed their petition on April 12, 1983, and made application to incur secured debt pursuant to 11 USC § 364 on April 13.

12. The Debtors have obtained a loan commitment totalling $92,000 from the Farmer's Home Administration. This loan is to be secured with the PIK entitlements, livestock and 1983 crops.

## MEMORANDUM

At issue in this adversary proceeding is a security interest in after acquired property of the Debtors.

The PCA duly filed with the proper office a financing statement describing its collateral as, among other property, "all existing or hereafter acquired: . . . general intangibles." The security agreement contains a like reference. The perfection of the security interest took place prior to the commencement of the bankruptcy case.

Thereafter and also prior to bankruptcy, the Debtors contracted with the CCC to withhold some of their corn acreage from production in exchange for a payment-in-kind from government-owned surplus grain to be delivered at the end of the 1983 growing season. This is the so called "PIK" program of the United States Department of Agriculture designed to reduce farm surplus and government subsidies, and boost the farm economy.

The Debtors wish to use their PIK "entitlements" as collateral to secure a loan of operating capital for the 1983 crop year. The PCA claims a consensual lien by way of a security interest in the entitlements based on the after acquired property clause of its security agreement covering general intangibles.

There are really two questions to be answered here: 1) was it the intent of the parties, as expressed in the security agreement, that PCA could look to future governmental subsidies as collateral for its loans to the Debtors; 2) if that was the intent, is the PIK contract with the government a general intangible adequately described in the security agreement and fi-

nancing statement so as to establish a security interest under Iowa's Uniform Commercial Code.

■ Before the court can consider whether the description of collateral meets the requirements of the UCC, it must examine Section 554.9204. That section requires that the parties "agree" that an interest attach.

The very breadth of the omnibus clause of the security agreement is indicative of an intent to include all of the Debtors' farm property interests. There are two economic features that have dominated modern farming, the farm credit system as a lender and government sponsored farm subsidies in one form or another.[2]

The PCA is a part of the farm credit system and the Debtors, farmers. Both would have to be conscious of the impact of the various farm programs in existence or that might come into existence on the farmer borrower's ability to meet his financial obligations. In the absence of any evidence to the contrary, the court must conclude that the omnibus clause in the parties' security agreement was intended to cover possible future property interests arising from the government's farm programs and in the last instance, PIK, the government's largess.

■ The agreement entered into by the CCC and the Debtors is a contract. "The Commodity Credit Corporation will enter into contracts with producers ...;" "Any producer may enter into a contract to divert ...;" "In the case of contracts diversion...." 48 Fed.Reg. 1476 (to be codified at 7 CFR Part 770). As there are acts required of each party to the diversion contracts before they are executed they are executory contracts within the intendment of that term under the Bankruptcy Code.

Although there is no statutory definition of an executory contract, the legislative his-

tory of Section 365 of the Code makes it clear that it "generally includes contracts on which performance remains due to some extent on both sides." H.R.Rep. No. 595, 95th Cong., 1st Sess., 347 (1977); S.Rep. No. 989, 95th Cong., 2nd Sess., 58, U.S.Code Cong. & Admin.News 1978, p. 5787 (1978). *Accord, Jenson v. Continental Financial Corp.,* 591 F.2d 477, 481 (8th Cir.1979) (a contract is executory where obligations of the debtor and the other contracting party remain partially and materially unperformed); *In re Knutson,* 563 F.2d 916, 917 (8th Cir.1977) (a contract is executory where both sides have substantial obligations to perform); *In re American Magnesium Co.,* 488 F.2d 147, 152 (5th Cir.1974) (a contract is executory where both parties have ongoing commitments). Under the Code, the definition of executory contract remains the same. *In re Alexander,* 670 F.2d 885 (9th Cir.1982); *In re Sun Ray Bakery, Inc.,* 5 B.R. 670 (Bkrtcy.D.Mass. 1980); *In re California Steel Co.,* 24 B.R. 185, 187 (Bkrtcy.N.D.Ill.1982); *In re O.P.M. Leasing Services, Inc.,* 23 B.R. 104, 117 (Bkrtcy.S.D.N.Y.1982); *In re Monsour Medical Center,* 11 B.R. 1014 (Bkrtcy.W.D. Pa.1981); *In re Rovine Corp.,* 6 B.R. 661 (Bkrtcy.W.D.Tenn.1980).

■ An executory contract is also property of the Debtors' bankruptcy estate. See, Fogel, *Executory Contracts and Unexpired Leases in the Bankruptcy Code,* 64 Minn.L. Rev. 341, 343 (1980). See also *Darby v. Atkinson (In re Ferris),* 415 F.Supp. 33 (W.D.Okl.1976).

■ The contractual right to a payment-in-kind in the contract between the parties is also a general intangible within the intendment of that term under Iowa's Uniform Commercial Code ("UCC"). Section 554.9106, *Code of Iowa* (1981).

A general intangible is any personal property (including things in action) other than

---

**2.** The Agriculture Adjustment Act of 1938; The Stabilization Act of 1942; The Agriculture Acts of 1948, 49, 54, 56 (Soil Bank), 58, 61; The Food and Agriculture Act of 1962; The Agriculture Adjustment Acts of 1964, 65, 70 (Feed Grain's Program); Agriculture and Consumer Protection Act of 1973; The Food and Agriculture Adjustment Act 1977; The Agriculture and Adjustment Act of 1980; Agriculture and Food Act of 1981; and finally the Special Program of Payment in Kind for Acreage Diversion for 1983 Crops.

goods, accounts, chattel paper, documents, instruments and money. This is a negative definition and residual classification of a type of Article 9 collateral. The official comment to Section 554.9106 (1972) states:

The term 'general intangibles' brings under this Article miscellaneous types of contractual rights and other personal property which are used or may become customarily used as commercial security. Examples are goodwill, literary rights and rights to performance. Other examples are copyrights, trademarks and patents, except to the extent that they may be excluded by Section 9–104(a).

The courts have classified others:

liquor licenses, *Paramount Finance Co. v. United States,* 379 F2d 543 (6th Cir.1967); Interstate Commerce Commission certificates of public convenience and necessity, 50 Op.Md.Att'y Gen. 437, 2 UCC Rep. Serv. 817 (1965); contractual rights to have goods manufactured to order, *American East India Corp. v. Ideal Shoe Co.,* 400 F.Supp. 141, 161–62 (E.D.Pa.1975); future income tax refunds, *In re Certified Packaging, Inc.,* 8 UCC Rep.Serv. 95 (Bankruptcy Judge, D.Utah 1970); and partnership interests, *see Waldrop [Waldrep] v. Jochum,* 337 So.2d 334 (Ala.App. 1976) (partnership interest in dairy cattle and milk base personal property). Beneficial interests in trusts and interests in decedents' estates that are not real estate interests also are general intangibles. Review committee, Final Report 241–42.

Dole, *The Fundamentals of Article 9 of the Uniform Commercial Code.* (University of Iowa 1982) § 1.4, p. 30.

One of the formal requirements of a valid security agreement is that it must contain a description of the collateral. Section 554.-9203(1)(a), *Code of Iowa* (1981). Any description of personal property is sufficient for purposes of Article 9 if it reasonably identifies what is described. Section 554.-9110.

■ The description of the collateral required for a financing statement by Section 554.9402 is sufficient if it makes possible the identification of the property described.

*U.S. v. First National Bank in Ogallala, Nebraska,* 470 F.2d 944 (8th Cir.1973). In passing on Minnesota's UCC, the Eighth Circuit has stated:

Because the purpose of the financing statement is to warn subsequent creditors rather than to identify the collateral, the UCC makes clear that the collateral need not be specified in the financing statement but may be described by "type." § 336.9–402(1). *See generally* Scult, *Accounts Receivable Financing: Operational Patterns under the Uniform Commercial Code,* 11 Ariz.L.Rev. 1, 12–13 (1969). The UCC commentary makes clear that it is ordinarily not expected that the financing statement itself will tell a subsequent creditor what collateral is already covered by a prior security interest. 'The notice itself indictes merely that the secured party who has filed may have a security interest in the collateral described. Further inquiry will be necessary to disclose the complete state of affairs.' § 336.9–402, official comment 2; *see James Talcott, Inc. v. Franklin National Bank, supra,* [292 Minn. 277] 194 N.W.2d [775] at 783 [1972]. *See also First National Bank & Trust Co. v. Atlas Credit Corp.,* 417 F.2d 1081 (10th Cir. 1969); *Bramble Transportation, Inc. v. Sam Senter Sales, Inc.,* 294 A.2d 97 (Del. Super.Ct.1971), *aff'd,* 294 A.2d 104 (Del. 1972). *See generally* J. White & R. Summers, Uniform Commercial Code § 23–16, at 961–64 (2d ed. 1980); Annot., 100 A.L. R.3d 10, § 13 (1980) (collecting cases).

*Thorp Commercial Corp. v. Northgate Industries, Inc.,* 654 F.2d 1245, 1249 (8th Cir. 1981).

■ In this case the description of the collateral is the same in the security agreement as it is the Financing Statement. Therefore, if the description satisfies the requirements for a security agreement, it will satisfy the perfection of the security interest by notice filing of the financing statement.

■ In describing after acquired property, general descriptions must be accepted

for it is not always easy to describe such property when drafting the agreement.

This court has adopted a liberal and flexible approach to the interpretation of Iowa's Section 554.910 in *In re Parsons College,* 1 Bankr.Ct.Dec. 122 (Bankr.S.D.Iowa 1974), relying on *First State Bank of Nora Springs v. Waychus,* 183 N.W.2d 728 (Iowa 1971); and *U.S. v. First National Bank in Ogallala, Nebraska, supra.*

Judge Mathes in *U.S. v. First National Bank in Ogallala, Nebraska,* in passing on Section 9–110 of the Nebraska's UCC states:

■ However, we are not convinced that the requirement in Section 9–203, *supra,* that the collateral be described, is a device for minimizing the amount of collateral a creditor can secure. That may be a laudable goal, but it is not encompassed by § 9–110. As the Comment to that section makes clear, the purpose of a description of collateral in a security agreement is only to evidence the agreement of the parties and therefore it need only 'make possible the identification of the thing described.' Comment, § 9–110 Neb.Rev.Stat. For example, in *James Talcott, Inc. v. Franklin Nat'l Bank of Minneapolis,* 292 Minn. 277, 194 N.W.2d 775 (1972), a case in which the Permanent Editorial Board for the U.C.C. appeared as amicus curiae, the collateral was described as

all goods (as defined in Article 9 of the Uniform Commercial Code) whether now owned or hereafter acquired.

194 N.W.2d at 778. The Minnesota Court held the description adequate under § 9–110, saying:

If the debtor himself is willing to give a creditor a security interest in everything he owns, the code does not prevent it, whether his action is prudent or not....

The description of the collateral [here] ... did what it was meant to do— namely it included all of the goods then owned, or to be owned in the future, by the debtor....

The parties sought to create a security interest in substantially all of the debtor's property. That is what was stated and that is what was meant. The parties did not particularize any further, and the statute does not require it. *Id.* [194 N.W.2d] at 782. *See also In re Varney Wood Products, Inc.,* 458 F.2d 435 (4th Cir.1972) (all accounts receivable); *United States v. Antenna Systems, Inc.,* 251 F.Supp. 1013 (D.N.H.1966) (all furniture, fixtures and equipment); *National Cash Register Co. v. Firestone & Co., Inc.,* 346 Mass. 255, 191 N.E.2d 471 (1963) (all goodwill, fixtures, equipment and merchandise.

In *In re Kendrick & King Lumber, Inc.,* 14 B.R. 764 (Bkrtcy.W.D.Okl.1981) the court held that a security agreement and financing statement covering "general intangibles" vested the creditor with a valid perfected security interest in a debtor's income tax refund under Oklahoma's UCC.

■ The conclusion reached is that the PCA has a valid and subsisting security interest in the Debtors' contract with the CCC. As the secured creditor, PCA is entitled to the fruits of the contract whenever they come into being, those being, the payments in kind.

The Debtors' analogy of the payment in kind to a lien on crops under a crop share lease is strained.

The Debtors' reliance on 11 U.S.C. § 552 is also untenable. Section 552(a) permits the avoidance of liens on property acquired by the estate or by a debtor after the commencement of a case. Here the contract, general intangible collateral, was in existence prior to bankruptcy.

■ Then, Section 552(b) provides that a pre-petition security interest in proceeds, product, offspring, rents or profits of the secured property will continue post-petition to the extent provided by the security agreement and applicable non-bankruptcy law.

The use of the term "proceeds" in Section 552 is not limited to the technical definition of that term in the UCC, but covers any property under which property subject to a

security interest is converted. H.Rep. No. 95–595, 95th Cong., 1st Sess. (1977).

The broad use of this term would include property received by way of payment-in-kind (non-cash proceeds) earned under a contract right. See *In re Munger,* 495 F.2d 511 (9th Cir.1974); *In re Nivens,* 22 B.R. 287 (Bkrtcy.N.D.Tex.1982). As *dicta* in *American East India Corp. v. Ideal Shoe Co.,* 400 F.Supp. 141, 168 (E.D.Pa.1975) in interpreting the term proceeds as used in the Uniform Commercial Code, Section 9–306 of the Pennsylvania Statute, the court stated that a proper interpretation of that section limited proceeds, in the case of performance of a contract, to situations where the proceeds were received by the debtor upon the debtor's performance of the contract. See *In re Whitaker,* 18 B.R. 314 (Bkrtcy.D.Kan. 1982).

■ The payment-in-kind under the CCC contract will be "proceeds" within the exception of Section 552(b), and the PCA's security interest in the debtor's right to payment-in-kind survives the filing of the bankruptcy case.

Finally, the Debtors argue that the Debtors' PIK rights cannot be alienated, citing: CCC–477 (Appendix), which is part of the contract specifically provides at 12, D and E:

D. Assignments with respect to quantities of a crop which can be received by a producer as payment-in-kind shall be made only if the assignor and assignee execute and file with the County Committee a Form CCC–479, Assignment of Payment-in-Kind.

E. Except as provided in Paragraph 12 D of this appendix, any payment-in-kind or portion thereof due any person shall be allowed without regard to questions of title under State law, and without regard to any claim or lien against the crop, or proceeds thereof, in favor of the owner or any other creditor.

These agreements are further amplified in the Regulations at Federal Register, Vol. 48 No. 44, p. 9235, para. 770.6:

[d] When any person who had an interest as a producer in the commodity or would have had an interest in the commodity as a producer if the commodity had been planted (herein called "predecessor") is succeeded on the farm by another producer (herein called "successor") after a contract has been executed, any payment in kind which is due and owing shall be divided between the predecessor and successor on such basis as the predecessor, successor, and the Department agree is fair and equitable, the contract shall be revised accordingly, and the successor shall sign the revised contract.

[e] Assignments with respect to quantities of a commodity which can be received by a producer as payment in kind will be recognized by the Department only if such assignment is made on Form CCC–479, Assignment of Payment-In-Kind, executed by the assignor and assignee, and filed with the county committee.

[f] Except as provided in paragraph [e] of this section, any payment in kind or portion thereof which is due any person shall be made without regard to questions of title under State law, and without regard to any claim of lien against the commodity, or proceeds thereof, which may be asserted by any creditor.

■ The federal government protects itself by antiassignment statutes. The general statutes are 31 U.S.C. § 3727 relating to assignment of claims against the United States, and 41 U.S.C. § 15 relating to the assignment of contracts, or an interest therein. In addition to these general statutes, there are specific statutes referring to specific types of claims and their assignment. The general antiassignment statutes ordinarily do not apply where another statute specifically determines the right of an assignee of a particular class of claims as does the regulations being considered here. See 6 Am.Jur.2d § 75, p. 257 (Assignments). See *U.S. v. Crain,* 151 F.2d 606 (8th Cir.1945), *cert. denied,* 327 U.S. 792, 66 S.Ct. 817, 90 L.Ed. 1019 (1946). The Supreme Court has ruled, however, that such a statute referring to 31 U.S.C. § 203 must, in spite of its broad language, be interpreted in the light of its purpose to give protection to the government so that

between the parties, effect might still be given to an assignment that failed to comply with the statute. *Segal v. Rochelle,* 382 U.S. 375, 86 S.Ct. 511, 15 L.Ed.2d 428 (1966).

In *In re Nivens, supra,* the court held that 7 CFR § 709.4(a) (1981) which required that a requisite form ASCS–36 be executed in order for an assignment to be recognized by the United States, the court stated:

> Nothing in the statutes or in the regulations indicate that ASCS monies cannot be used as collateral for crop loans obtained by the recipients. Accordingly, I conclude that the claim by the bank and by SBA of security interest is not defeated by the fact that Assignment of Payment Form ASCS–36 was not executed and filed with the county office of ASCS.

at page 291.

See *U.S. v. Crain, supra.* The assignment as between the parties is valid.

## ORDER

It is, therefore, ORDERED, by the court that the application to incur secured debt, filed April 13, 1983, by the Debtors herein, be and it hereby is, denied.