In re Robert D. LIEBE, Joyce Liebe, Debtors.

SANDAGE REAL ESTATE, INC., Plaintiff,

v.

Robert D. LIEBE, Joyce Liebe and Norwest Bank, Marion, National Association, Defendants.

Bankruptcy No. 83–00054.
Adv. No. 83–0750C.

United States Bankruptcy Court, N.D. Iowa.

Sept. 25, 1984.

Michael Mallaney, Des Moines, Iowa, for plaintiff.

Michael H. Irvine, Cedar Rapids, Iowa, for debtors.

Thomas Peffer and David P. McManus, Cedar Rapids, Iowa, for Bank.

Findings of Fact, Conclusions of Law, and ORDER re Interest in Payment-In-Kind Entitlements, with Memorandum

WILLIAM W. THINNES, Bankruptcy Judge.

This matter comes before the Court on a Complaint for relief from the stay and declaratory judgment by plaintiff, Sandage Real Estate, Inc., a cross claim and counterclaim by Norwest Bank of Marion and

counterclaim by Debtors-in-Possession (Debtors). By previous Order of the Court the stay was lifted as to Plaintiff so as to permit the forfeiture of Debtors' interest in a real estate contract. At issue here is which party is entitled to Payment-in-Kind (PIK) entitlements generated by acceptance of the contract sale property into the government entitlement program. At trial, plaintiff was represented by Michael Mallaney of Des Moines, Iowa, while Michael Irvine and Thomas Peffer of Cedar Rapids, Iowa, appeared for the Debtor-in-Possession and Norwest Bank Marion, N.A., respectively. The Court, having heard the testimony, examined the record and being fully advised, now makes the following Findings of Fact, Conclusions of Law and Orders.

### FINDINGS OF FACT

1. On February 25, 1983, the Debtors, Robert D. Liebe and Joyce Liebe, filed a voluntary petition under Chapter 11 of the Bankruptcy Code.

2. Norwest Bank Marion, N.A., f/k/a First National Bank of Marion (Norwest), over the years has provided financing for Debtor Robert Liebe's farming operations and, at least since 1977, has maintained a perfected security interest in Debtors' farm assets.

3. A portion of the Debtors' estate at filing consisted of a 105-acre farm located in Linn County, Iowa, which for purposes of this litigation will be referred to as the "Sandage Farm."

4. The Sandage Farm was purchased on contract by Debtors' son, Gary, from plaintiff, Sandage Real Estate, Inc. (Sandage) on December 12, 1980, for $252,000. The contract called for a $70,000 down payment with a principal and interest payment due on March 1st every year thereafter until 1985 when the remaining balance came due. The down payment was borrowed from Norwest Bank and personally guaranteed by Debtor, Robert Liebe. Additionally, Gary Liebe executed an equity assignment in favor of Norwest on April 1, 1981.

A March 1982 payment of $21,300 was made.

5. Because Gary Liebe was in dire financial straits, Norwest required him to liquidate his farming operations in the fall of 1982 and the liquidation proceeds were applied to his secured indebtedness.

6. On February 11, 1983, Gary Liebe, by Special Warranty Deed, conveyed his interest in the Sandage Farm to Debtor, Robert Liebe.

7. On February 21, 1983, the Debtor Robert Liebe, applied to enroll the Sandage Farm in the PIK program for the crop year of 1983. His application was approved by the government on April 22, 1983. The Debtor subsequently maintained the PIK acres as required by federal regulations and fulfilled all obligations required of PIK producers at a reasonable cost of $4,291.88.

8. The Court takes judicial notice of the PIK program and federal regulations governing the entitlement program.

9. Because the March 1983 payment of approximately $20,950 due on the Sandage Farm was never paid, Sandage, after obtaining a lift of the stay, instituted forfeiture proceedings under Chapter 656 of the Iowa Code and became entitled to possession on September 1, 1983.

10. The PIK entitlements on the Sandage Farm were distributed on October 15, 1983.

### CONCLUSIONS OF LAW

The Court concludes:

1. Norwest Bank's perfected security interest does not extend to Debtors' PIK entitlements.

2. Under Iowa law, a contract seller who has forfeited the buyer is entitled to unaccrued rents and profits.

3. Sandage Real Estate, Inc. has no interest in Debtors' PIK entitlements because the entitlements do not constitute rents and profits of the forfeited real estate.

4. Even if the entitlements constitute rents or profits, Sandage cannot claim

them because Debtors' right to receive the entitlements had already accrued by the time forfeiture placed Sandage in possession.

5. Debtors' PIK entitlements constitute property of the estate that is unencumbered by any interest of Sandage Real Estate, Inc. or Norwest Bank.

### ORDERS

IT IS THEREFORE ORDERED that:

1. Norwest Bank's counterclaim and crossclaim for the PIK entitlements and its request to lift the stay allowing it to collect those entitlements is hereby denied.

2. Sandage Real Estate, Inc.'s request for a declaratory decree that it has a first and prior claim to the PIK entitlements as titleholder of the Sandage Farm and its request for an order lifting the stay so it can collect those entitlements is hereby denied.

3. Debtors counterclaim for the PIK entitlements is sustained.

### MEMORANDUM

1. *Norwest's Claim to PIK Entitlements*

■ The Court concludes there are two grounds for denying Norwest's claim to the PIK entitlements arising from enrollment of the Sandage Farm in the government program. First the plain language of Norwest's security agreement does not purport to give it a security interest in after-acquired contract rights of the Debtors. Secondly, and even more important than the deficiencies in the security agreement, 11 U.S.C. § 552 precludes Norwest from relying on its prepetition security agreement to assert a lien in Debtors' postpetition PIK contract.

(a) *Norwest's Security Agreement*

Norwest claims an interest in the proceeds of the Sandage Farm PIK contract by virtue of a validly perfected security agreement giving it a security interest in "all equipment, all farm products, including

but not limited to crops, livestock, supplies used or produced in farming operations now owned or hereinafter acquired, *contract rights* and accounts and all proceeds" of the Debtors. (emphasis added). This agricultural security agreement was executed on June 1, 1982, while the PIK contract did not come into existence until the spring of 1983. Consequently Norwest can only claim a security interest in the PIK contract and the entitlements if its security agreement contains an after-acquired property clause as to the type of collateral created by acceptance into the PIK program. In the context of the Uniform Commercial Code, the PIK entitlement program creates a contract right which would be classified as general intangibles collateral. *See* Iowa Code § 554.9106 and official comment, *Thorp Credit v. Fowler,* 41 B.R. 962 at 963 (Bankr.N.D.Iowa 1984); *Matter of Sunberg,* 35 B.R. 777, 781–82 (Bankr.S.D.Iowa 1983) *aff'd* 729 F.2d 561 (8th Cir.1984). Although Norwest's security agreement did not mention the broad category of general intangibles, it did assert an interest in a specific intangible, i.e. contract rights of the Debtors; thus, if all other requirements are satisfied, it would have a security interest in the contract right created by acceptance of the Sandage Farm into the PIK program.

Unfortunately, even under a generous construction of the security agreement, the "now owned or hereinafter acquired" language can only be construed as modifying the personalty described prior to the appearance of that particular phrase in the security agreement and would not extend to the subsequent personalty described as "contract rights and accounts and all proceeds." Thus by the plain terms of the Bank's security agreement its interest in the contract rights of the Debtors would not include contract rights that came into existence after the security agreement was executed in June of 1982. Since the Sandage Farm was not enrolled in the PIK program until 1983, the absence of an after-acquired clause in relation to contract

rights precludes the Bank from asserting any claim to Debtors' PIK entitlements.

#### (b) *11 U.S.C. § 552*

Even assuming Norwest's security agreement could be construed as giving it a security interest in Debtors' after-acquired contract rights, the Bank would nevertheless be precluded from asserting a security interest in the PIK entitlements by operation of section 552 of the Bankruptcy Code. While the parties throughout the litigation have assumed the PIK contract came into existence on February 21, 1983, when Debtors filed an application to enroll the Sandage Farm in the government program, this Court determines otherwise. In particular, the appendix to the PIK contract states that "[t]he contract is effective when signed by the operator, and each of the producers on the farm and a member of the County Committee, or a person to whom the County Committee has redelegated signature authority on behalf of CCC" [Commodity Credit Corporation]. The PIK contract in question was not approved and signed by a representative of CCC until April 22, 1983, approximately two months after the Debtors filed their voluntary petition.

Given this timing of events, the property was acquired post-petition, and Norwest's rights in the property would be governed by section 552:

> (a) Except as provided in subsection (b) of this section, *property acquired* by the estate or by the debtor *after the commencement* of the case *is not subject to any lien resulting from any security agreement entered into* by the debtor *before the commencement* of the case.

> (b) Except as provided in sections 363, 506(c), 544, 545, 547, and 548 of this title, if the debtor and a secured party enter into a security agreement before the commencement of the case and *if the security interest* created by such security ty agreement *extends to property* of the debtor *acquired before the commencement* of the case *and to proceeds,* product, offspring, rents, or profits of such property, *then such security interest extends to such proceeds,* product, offspring, rents, or profits *acquired* by the estate *after the commencement* of the case *to the extent provided by such security agreement and by applicable non-bankruptcy law,* except to the extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

(emphasis added).

Under section 552(a), the commencement of bankruptcy cuts off any security interest in postpetition property that would otherwise arise by virtue of an after-acquired property clause in a prepetition security agreement unless the exception in subsection (b) applies. Essentially, the § 552(b) exception [1] allows a secured creditor to assert a security interest in postpetition property if its prepetition security agreement extends to "proceeds, product, offspring, rents or profits". In other words, "proceeds, product, offspring, rents or profits" of secured collateral may be secured by a prepetition security agreement if, but only if, the primary collateral was acquired by the debtor prior to the commencement of the case.

PIK entitlements have been recognized as proceeds of the general intangible collateral (PIK contract) within the intendment of section 552(b), *Sunberg,* 35 B.R. 783–84. Notwithstanding this fact, Norwest cannot assert a security interest in the PIK proceeds because the collateral generating those proceeds was not acquired by the Debtors prior to commencement of bankruptcy. In sum, the filing of the Debtors' bankruptcy cut off any interest Norwest would otherwise have in the postpetition PIK contract and it cannot rely on the 552(b) exception to establish an interest in the "proceeds" of that contract. *See Thorp Credit v. Fowler,* 41 B.R. 962 at 963

---

1. This exception is yet subject to the provisions of 11 U.S.C. § 363, 506(c), 544, 545, 547 and 548;

however, none of these are applicable to this case and therefore will not be discussed.

(Bankr.N.D.Iowa 1984); *In re Kruse,* 35 B.R. 958, 960 (Bankr.D.Kan.1983).

### 2. *Sandage Real Estate, Inc.'s Claim to PIK Entitlements*

Sandage bases its claim to Debtors' PIK entitlements on its rights as a land contract seller who has forfeited out the buyer. Because forfeiture placed it in possession of the property on September 1, 1983 approximately 45 days before the PIK entitlements were distributed on October 15, 1983, Sandage asserts it is entitled to receive Debtors' PIK corn as unaccrued rents or profits of the forfeited property.

■ Generally, Iowa law provides that a vendor who has forfeited a defaulting purchaser is entitled to receive unaccrued rents from the real estate. *Johnson v. Siedel,* 178 Iowa 244, 159 N.W. 677 (1916). Rent belongs to the person entitled to possession when it accrues. *Hall v. Hall,* 150 Iowa 277, 129 N.W. 960 (1911).

One issue raised by Sandage's claim is whether Debtors' PIK entitlements should be classified as rents or profits of the Sandage Farm. While the Iowa Supreme Court has not ruled on this specific question, that Court, in evaluating a rents and profits clause in a real estate mortgage, characterized those terms in the following manner:

The phrase "rents, issues and profits" as distinguished from the land itself refers to the products of the land, the annual rentals, the income derived therefrom, whether in money or in products .... It has been said that "to cultivate and have the use of the lands is to receive the rents and profits." Where one by lease agrees to pay a certain sum for the right to cultivate and use the land, the sum so stipulated is rent, and represents the landlord's share in the issues and profits of the land, and where the lease provides for a share of the crop, the share of the crops represents the landlord's portion of the issues and profits derived from the use and cultivation of the land. Part of it may be paid in cash and part of it in crops or products .... The word "profits" as used in the phrase "rents, issues and profits" is synonymous with "rents."

*Equitable Life Ins. Co. of Iowa v. Brown,* 220 Iowa 585, 590, 262 N.W. 124, 127 (1935) (authorities omitted). Basically, rents and profits are synonymous terms and include all products or income generated by use and cultivation of the land. This definition accords with the approach taken by other courts. *See, i.e., Fairchild v. Gray,* 136 Misc. 704, 707, 242 N.Y.S. 192, 196 (1930). (Profits as applied to realty means products of the land including everything produced, furnished, or earned by realty or received for its use); *In re Vedder's Will,* 15 N.Y.S. 798, 805 (1891) (The word profits when applied to real estate means produce of the land and is when used in the phrase "rents issue and profits" synonymous with "rents."); *Detroit Trust Co. v. Detroit City Service Co.,* 262 Mich. 14, 42–43, 247 N.W. 76, 85 (1933). (At common law profits when used in connection with rents means usufruct of the land and under the term profits is comprehended the products of the soil whether it arises above or below the surfaces).

As is evident from these pronouncements, these terms apparently are expansive enough to permit this Court to hold that Debtors' PIK entitlements constitute rents or profits of the Sandage Farm.[2] At least one bankruptcy court has held that since PIK entitlements are a substitute for crops that would otherwise be produced, and crops constitute rents and profits, the entitlements must also be classified as rents and profits. *In re Preisser,* 33 B.R. 65, 67 (Bankr.D.Colo.1983). *See also*

---

**2.** Such a holding would be consistent with the Eighth Circuit's recognition in *Matter of Sunberg,* 729 F.2d 561 (1984) and this Court's earlier determination in this case that a PIK contract constitutes general intangibles collateral in the context of Uniform Commercial Code (UCC).

The reach of the UCC is confined to commercial financing transactions of personalty, and classification of collateral in that limited sphere would not preclude a different characterization of the same property in the real estate context.

*Froetschner v. Silkman,* 146 Colo. 554, 362 P.2d 191 (1961) (where real estate contract silent as to division of government soil bank payments, trial court acted reasonably in dividing those "rental" payments between a vendor and purchaser in proportion to each part of the year each had been precluded from using the land).

■ Despite the broadness of the rents and profits concept, the Court does not believe it should be extended to include Debtors' PIK entitlements.

While the PIK bushels earned by Debtors' agreement not to produce could, in the broadest sense, be characterized as income generated by the land, yet those entitlements are qualitatively different from crops, minerals, timber or other products directly produced by the soil and so intimately connected to the real estate that the right to them can not be divorced from the right to possession. Similarly, in the case of cash rentals arising from a lessee's use and cultivation of the land, the reason for awarding those to a contract seller who has forfeited is that such payments are an incident of the land and necessarily reside in the party legally entitled to possession. In the rental situation, a buyer's lessee takes subject to the rights of the contract seller and once the property is forfeited, the lessee stands in the same relationship with the seller that he previously had with the buyer. Forfeiture, by divesting a contract buyer of any right, title, or interest in the land, necessarily strips him of any right to receive all fruits of the land that are inseparable from the real estate.

In contrast, the PIK contract is personal to a producer and creates a third party contractual relationship between the government and producer that is independent from the land contract. Even recognizing that possession of the property was necessary to enter into a PIK contract initially and establish the amount of entitlements, forfeiture would not divest the buyer of his contractual rights and vest those rights in the seller.[3] If forfeiture was accomplished early enough in the crop year, the loss of possession might cause a buyer to breach his agreement with the government, but this is markedly different from saying the forfeiture divested a producer of his intangible contract rights and vested them in the seller as incident of the reversion. In light of this fact, the Court finds there is a qualitative difference between the intangible contract rights created by the PIK contract and other products, fruits or income that are so inseparable from the land that forfeiture necessarily includes the right to receive those products as an incident of the reversion of possession. Because the PIK contract and the entitlements it creates are attenuated in their relationship to the land, the Court concludes they should not be classified as rents or profits of the land.

■ Even assuming the concept of rents and profits includes PIK entitlements, Sandage's claim for those entitlements still would not prevail in the circumstances of this case.[4] As noted earlier, a contract

---

**3.** 7 CFR § 770.6(d) apparently establishes the exclusive means to substitute a subsequent producer for the original producer by providing: When any person who had an interest as a producer in a commodity or would have had an interest in the commodity as a producer if the commodity would have been planted (herein called predecessor) is succeeded on the farm by another producer (herein called successor) after a contract has been executed, any payment in kind which is due and owing shall be divided between the predecessor and successor on such basis as the predecessor, successor and the Department agree is fair and equitable, the contract shall be revised accordingly, and the successor shall sign the revised contract.

**4.** There may be yet another reason for denying Sandage's claim. Specifically, 91 C.J.S. *Vendor & Purchaser* § 151 states that a purchaser is entitled to take off those crops he has sown in the due course of husbandry before a forfeiture is declared by the vendor. Consequently, even if the court in *Preisser,* 33 B.R. 65, 67 (Bankr.D. Colo.1983) was correct in holding that PIK bushels were rents and profits because they constitute a substitute for crops, this rule, apparently would award the crops to the buyer, particularly, where as here, the crop year had, for all practical purposes, ended by the September 1, reversion date.

seller who has forfeited the buyer is entitled to receive unaccrued rents or profits, or those rents and profits that accrue when he legally becomes entitled to possession. The Iowa Court apparently equates the term accrue, at least in the case of cash rents, with the term due. *Hall v. Hall,* 150 Iowa 277, 129 N.W. 960 (1911). BLACK'S LAW DICTIONARY (5th ed. 1979) at p. 19 defines accrue as "in the past tense due and payable; vested." Due, on the other hand is accorded several meanings, one of which is a debt or payment that is justly owed even though it might not yet be payable. *Id.* at 448.

The PIK contract does not specify a payment date for the entitlements, however, the appendix to the contract provides in relevant part that:

> each producer who devotes to approved conservation uses the acres of eligible land ... and who otherwise complies with terms and conditions specified in the contract and this appendix shall receive from CCC within the availability period title to a quantity of the crop equal to that quantity which represents the producer's share of the quantity specified in ... the contract.

Elsewhere the appendix defines the availability period as "the 5-month period beginning with the harvest date as determined and announced by the Secretary for the crop in the producer's area." *See also* 7 CFR § 770.3(3). In this case, Debtors' PIK bushels became available on October 15, approximately a month and a half after forfeiture.

Sandage apparently rests its claim that Debtors' PIK entitlements were unaccrued at the time of the reversion on the fact that traditional cash rentals would not accrue until the date of payment. Even though cash rentals would not accrue until the date fixed for payment, the Court is not convinced that the availability date for PIK entitlements is legally synonymous with the date Debtors' rights under the PIK contract accrued. Specifically, the Court

concludes Sandage has not met its burden of proving that the right to the PIK entitlements accrued after the reversion of possession.

On the contrary, what little evidence there is on this issue seems to indicate otherwise. For one thing, timing the availability date to coincide with the harvest season was based on the government's concern that "[e]arlier release of these commodities could distort the usual seasonal price patterns for both old crop and new crop commodities," 48 Fed.Reg. 44, 9233 (1983). Thus, the availability date apparently was not aimed at fixing the right to receive the PIK commodities.

More importantly, Debtors' contractual obligations had all been performed by September 1, 1983. The land had been held out of production for the 1983 crop year and the conservation measures had been completed.[5] All that remained was collection of the PIK corn when it became available on October 15, 1984. In short, the right to receive payment under the PIK contract had already vested or accrued by the time Debtors were legally divested of possession, and Sandage cannot now claim those entitlements merely because the PIK corn was not available until shortly after the forfeiture.

### 3. *Debtors' Claim to PIK Entitlements*

■ Having determined, that neither Norwest nor Sandage has a valid prior interest in Debtors' PIK entitlements, the Court concludes those entitlements are property of the estate that may be used by the Debtors in their Plan of Reorganization.

---

5. The farm manager at Sandage admitted that nothing was done to the land from September 1, the date it came into possession to October 15, the date the PIK corn became available.