In the Matter of Victor C. BUTZ, Patricia Butz, Engaged in Farming, Debtors.

Bankruptcy No. 87–439–C.

United States Bankruptcy Court, S.D. Iowa.

April 27, 1988.

Anita L. Shodeen, Des Moines, Iowa, trustee.

Deborah S. Krauth, Chariton, Iowa, Douglas J. Reed, Des Moines, Iowa, for debtors.

Kevin R. Query, Asst. U.S. Atty., Des Moines, Iowa, for FmHA.

## ORDER ON OBJECTION TO PLAN

LEE M. JACKWIG, Chief Judge.

On December 3, 1987 a preliminary hearing on confirmation of plan was held in Des Moines, Iowa. Among those present at the hearing were Deborah S. Krauth and Douglas J. Reed appearing on behalf of the debtors and Kevin R. Query, Assistant U.S. Attorney, appearing on behalf of the Farmers Home Administration (FmHA). The parties dispute whether the FmHA has any rights to certain government payments. The parties subsequently submitted the matter on briefs and a stipulation of facts.

### FACTUAL BACKGROUND

The FmHA holds a mortgage to real estate owned or being purchased by the debtors as security for its loans. The debtors had been purchasing a parcel on contract. The contract vendor commenced forfeiture proceedings on August 22, 1985 and, as a result, the FmHA paid off the contract balance and succeeded to the interest of the contract vendor. In addition to real estate, the mortgage in question provides the FmHA with an interest in:

> [A]ll rights, interests, easements, herediments and appurtenances thereunto belonging, the rents, issues, and profits thereof and revenues and income therefrom, all improvements and personal property now or later attached thereto or reasonably necessary to the use thereof, including, but not limited to, ranges, refrigerators, clothes washers, clothes dryers, or carpeting purchased or financed in whole or in part with loan funds, all water, water rights, and water stock pertaining thereto, and all payments at any time owing to Borrower by virtue of any sale, lease, transfer, conveyance, or condemnation of any part thereof or interest therein—all of which are herein called 'the property.'

Prior to filing bankruptcy on February 20, 1987 the debtors signed a contract to participate in the 1986 Feed Grain Program (Program). The debtors have received the following benefits under the 1986 Program.

| DATE | AMOUNT | TYPE |
|------|--------|------|
| 09/09/86 | $2,874.33 | Cash |
| 05/16/86 | $1,378.20 | PIK |
| 03/12/87 | $1,274.31 | PIK |
| 03/19/87 | $ 277.53 | Check |
| 10/08/87 | $1,921.40 | Cash |
| 10/08/87 | $2,007.73 | PIK |

The debtors received $224.69 for their participation in diversion payments.

The debtors signed up for the 1987 Program on February 24, 1987. The nature of the benefits received under the 1987 Program are as follows:

| DATE | AMOUNT | TYPE |
|------|--------|------|
| 04/09/87 | $374.37 | Cash |
| 04/09/87 | $374.36 | PIK |
| 07/10/87 | $243.00 | PIK |

The debtors also enrolled in the Conservation Reserve Program (CRP). The Agricultural Stabilization and Conservation Service (ASCS) County Committee accepted the debtors' offer to place 255.8 acres in the CRP on September 29, 1986. The debtors have received a cost-share payment of

$4,374.00 to defray costs of seeding and fertilizing the CRP acres. The debtors are entitled to receive $17,906.00 in annual payments under the CRP.

Under the debtors' plan, the FmHA's allowed secured claim is fixed at $102,500.00. They contend this figure represents the value of the FmHA's first mortgage interest in the real estate. This figure does not reflect the benefits the debtors have received or will receive under CRP and the Programs.

## DISCUSSION

### I.

Under the Feed Grain Program, producers receive deficiency payments and price support loans for compliance with certain requirements such as reducing crop acreage. *See generally,* 7 C.F.R. Part 713. Farmers who are accepted into the CRP agree to take erodible land out of production for a period of 10 years in exchange for cost-share payments and annual rental payments. *See generally,* 7 C.F.R. Part 704. The ASCS administers both programs. The FmHA maintains that its allowed secured claim should reflect its alleged interest in the government payments. The FmHA claims an interest in the payments by means of the "rents and profits" clause contained in the mortgage executed by the debtors.

■ The FmHA cites *In re Preisser,* 33 B.R. 65 (Bankr.D.Colo.1983) in support of its position. There a debtor executed a deed of trust containing a "rents and profits" clause in favor of the United States. The court found that the government benefits the debtors received for not producing crops (payments made in the form of grain known as "PIK" payments) were rents and profits. The court reasoned that the grain the debtor received was a substitute for what would have been produced on the land. The court therefore concluded that the United States had a valid security interest in the payments. The late Judge William W. Thinnes reached the opposite result in *In re Liebe,* 41 B.R. 965 (Bankr.N.D.

Iowa 1984). In that case, a real estate contract vendee enrolled in the 1983 PIK program. The contract vendor forfeited out the vendee before PIK entitlements were disbursed. The vendor claimed the PIK grain as unaccrued "rents and profits" of the forfeited property.

The court examined Iowa Supreme Court cases and cases from other jurisdictions and noted that the term "rents and profits" includes "all products or income generated by use and cultivation of the land." *Id.* at 969. However, the court found that despite the broadness of the "rents and profits" concept, PIK entitlements could not be classified as "rents and profits" of the land. The court distinguished those entitlements from products produced directly by the soil, such as crops and minerals:

Forfeiture, by divesting a contract buyer of any right, title, or interest in the land, necessarily strips him of any right to receive all fruits of the land that are inseparable from the real estate.

In contrast, the PIK contract is personal to a producer and creates a third party contractual relationship between the government and producer that is independent from the land contract. Even recognizing that possession of the property was necessary to enter into a PIK contract initially and establish the amount of entitlements, forfeiture would not divest the buyer of his contractual rights and vest those rights in the seller. If forfeiture was accomplished early enough in the crop year, the loss of possession might cause a buyer to breach his agreement with the government, but this is markedly different from saying the forfeiture divested a producer of his intangible contract rights and vested them in the seller as incident of the reversion. In light of this fact, the Court finds there is a qualitative difference between the intangible contract rights created by the PIK contract and other products, fruits or income that are so inseparable from the land that forfeiture necessarily includes the right to receive those products as an incident of the reversion of possession. Because the PIK contract and the entitlements it creates are atten-

uated in their relationship to the land, the Court concludes they should not be classified as rents or profits of the land. *Liebe*, 41 B.R. at 970 (footnote omitted).

Judge Thinnes' analysis is persuasive and applicable to the government payments involved in this case. Like the 1983 PIK contract, the contracts for participation in the Feed and Grain Programs and the CRP are personal to the producer and establish contractual relationships between the government and the producer. Such contractual relationships are independent from the mortgage. Through foreclosure, a mortgagee could lose all rights in the land but still retain contractual rights under the programs. For example, under the CRP, a former owner of land can receive a payment based upon the period of the fiscal year during which the former owner controlled the land or based upon an agreement between the former and present owner. 7 C.F.R. section 704.20(a)(3). Under the Feed and Grain Program, payments are divided between the predecessor and successor in interest to a crop in a manner the parties and the government agree is equitable. 7 C.F.R. section 713.151(b). The attenuated nature of the relationship between the government contracts and the land leads the court to conclude the government payments are not "rents and profits" of the land.

Parenthetically, the court notes that the statutory and regulatory provisions governing the CRP denominate payments as "rental payments". *See* 16 U.S.C. sections 3831, 3832, 3833, 3834; 7 C.F.R. sections 704.2(a)(2) (definition of "annual rental payment"), 704.10, 704.12, 704.20. One court has stated that CRP payments are in the nature of "rent". *In re Ratliff*, 79 B.R. 930 (Bankr.D.Colo.1987). In that case, the FmHA held a deed of trust and objected to a Chapter 12 plan by contending that it had an absolute right to all future CRP payments under a "rents and profits" clause. The court found that the FmHA's claim to the CRP payments under the deed of trust could not "be wholly ignored". *Id.* at 932. The court went on to explain that the debtors' interest in the CRP payments had val-

ue that had to be protected under 11 U.S.C. section 1225(a)(5)(B). However, mere characterization of the payments as "rental payments" does not automatically mean that the payments are subject to a rents and profits clause. Rather, a determination whether government benefits can be construed as "rents and profits" as the concept has been interpreted under state law should be made pursuant to the *Liebe* analysis.

## II.

■ Even if the court were to find that the term "rents and profits" embraced government payments, federal regulations would preclude the FmHA from encumbering the payments under the facts of this case. Before discussing these regulations, it is important to examine state law pertaining to the operation of "rents and profits" clauses. Under Iowa law, two lines of cases have developed considering the effect of "rents and profits" provisions in mortgages. One line of cases holds that where rents and profits are merely pledged as security for payment of the mortgage debt, the mortgage does not attach to the rents and profits until a default occurs, an action is commenced and the appointment of a receiver is requested. *Owen v. Fink*, 218 Iowa 412, 255 N.W. 459 (1934); *First Trust Joint Stock Land Bank v. Conway*, 215 Iowa 1031, 247 N.W. 253 (1933); *First Trust Joint Stock Land Bank v. Cuthbert*, 215 Iowa 718, 246 N.W. 810 (1933); *Andrew v. Home Savings Bank*, 215 Iowa 401, 246 N.W. 48 (1932). A second line of cases finds that where a mortgage grants a lien upon the rents and profits of the mortgaged property, the lien attaches at the time of the execution of the mortgage. *Equitable Life Ins. Co. of Iowa v. Brown*, 220 Iowa 585, 262 N.W. 124 (1935); *Soehren v. Hein*, 214 Iowa 1060, 243 N.W. 330 (1932); and *Farmers' Trust and Sav. Bank v. Miller*, 203 Iowa 1380, 214 N.W. 546 (1927). The distinction the cases draw is that a chattel mortgage is created in "rents and profits" when the term "rents and profits" is included in the granting clause of the mortgage, whereas the operation of a *pledge* of "rents and profits" to

secure payment of the mortgage debt could only be triggered by default, foreclosure and appointment of a receiver. Here the "rents and profits" clause is contained in the granting clause of the FmHA's mortgage. Under the aforementioned cases, the FmHA's interest in "rents and profits" attached at the time the parties executed the mortgage.[1]

Again assuming that the government benefits are "rents and profits", the fact that the FmHA established its interest in "rents and profits" at the time the parties executed the mortgage does not end the analysis. Consideration must be given to the effect federal statutes and regulations have upon the operation of state law.

Regulations governing the CRP program are found at 7 C.F.R. Part 704. The regulation pertaining to assignments provides:

> Any participant who may be entitled to any cash payment under this program may assign the right to receive such cash payment, in whole or in part, *as provided in the regulations at 7 CFR Part 709, Assignment of Payment.*

7 C.F.R. section 704.17 (emphasis added). The regulation concerning assignments of cash payments made under the Feed Grain Program states:

> Any producer entitled to any payments may assign any such payments which are made in cash *in accordance with regulations governing assignment of payment found at Part 709 of this chapter.*

7 C.F.R. section 713.153 (emphasis added). 7 C.F.R. section 709.3 sets out the conditions under which payments may be assigned:

> (a) A payment which may be made to a producer under any program to which this part is applicable may be assigned only as security for cash or advances to finance making a crop, handling or marketing an agricultural commodity, or performing a conservation practice, for the current crop year. No assignment may be made to secure or pay any pre-existing indebtedness of any nature whatsoever.
>
> (b) To finance making a crop means (1) to finance the planting, cultivating, or harvesting of a crop, including the purchase of equipment required therefor and the payment of cash rent for land used therefor, or (2) to provide food, clothing, and other necessities required by the producer or persons dependent upon him.
>
> (c) Nothing contained herein shall be construed to authorize an assignment given to secure the payment of the whole or any part of the purchase price of a farm or the payment of the whole or any

---

1. Iowa abandoned lien perfection of chattel mortgages by recordation upon adoption of the Uniform Commercial Code. *See* 1965 Iowa Acts, ch. 413, section 10102 (repealed Iowa Code chapter 556 which governed chattel mortgages). However, the UCC does not apply to the creation of interests in real estate including rents derived therefrom. Iowa Code section 554.-9104. Therefore, a creditor relying on a granting interest in rents and profits must perfect its interest by commencing foreclosure and requesting appointment of a receiver. There is some question as to whether federal lenders are bound by state perfection laws. In *U.S. v. Landmark Park & Associates,* 795 F.2d 683 (8th Cir.1986), the Eighth Circuit found that state perfection laws did not apply to perfection of an assignment of rents contained in a Department of Housing and Urban Development (HUD) mortgage. The court in that case ruled that HUD's interest became perfected upon default despite the fact that under state law, creditors only could perfect by obtaining possession of the mortgaged property and having a receiver appointed. The court reasoned that protection of a federal lender required a uniform perfection rule because of the diversity of perfection laws among the states. In *In re Buckley,* 73 B.R. 746 (D.S.D.1987), the FmHA argued that an overriding federal interest in uniformity warranted a finding that state perfection laws did not apply to the perfection of the FmHA's interest in "rents and profits" created in a mortgage. The court rejected this argument. It distinguished *Landmark Park* by noting that the FmHA mortgage did not contain an assignment of rents provision as did the HUD mortgage in *Landmark Park.* The court explained that state laws regarding the perfection of rents were "uniform and longstanding". *Buckley,* 73 B.R. at 749. The court went on to remark that the only exception to applying state law was in a case such as *Landmark Park* where the parties clearly expressed their intention that perfection would occur merely upon default rather than upon completion of the acts required by state law.

part of a fixed commodity rent for a farm.

This court has ruled that program payments made in cash are subject to the limitations of subsections (a) and (b) and that such payments may not be encumbered to secure pre-existing indebtedness. *Matter of Halls*, 79 B.R. 417 (Bankr.S.D. Iowa 1987). Nothing in the record indicates that the FmHA made advances to the debtors in 1986 or 1987 to finance making a crop. Consequently, the FmHA cannot encumber the 1986 or 1987 government payments made in cash.

The court notes that subsection (c) prevents assignment of payments to secure the purchase price of a farm. To the extent any of the indebtedness secured by the mortgages relates to loans used for the purchase of a farm, assignment is prohibited.

■ Payments under the Programs may be made in certificates. 7 C.F.R. sections 704.16 (CRP) and 713.154(a) (Feed Grain). Certificates may be "generic" or "commodity-specific". 7 C.F.R. section 770.4(g). If generic, the certificate may be exchanged for any commodity made available by the Commodity Credit Corporation. *Id.* If commodity-specific, the certificate may be exchanged only for the kind and quantity indicated on the face of the certificate. *Id.*

In *Halls, supra,* this court held that the regulations found at 7 C.F.R. section 770.-4(b) prohibited creditors from encumbering certificates. The provision provides:

(b) Liens, encumbrances, and State law.
(1) The provisions of this section or the commodity certificates shall take precedence over any state statutory or regulatory provisions which are inconsistent with the provisions of this section or with the provisions of the commodity certificates.
(2) Commodity certificates shall not be subject to any lien, encumbrance, or other claim or security interest, except that of an agency of the United States Government arising specifically under Federal statute.

*Id.* Under subsection (2), an exception to the encumbrance prohibition exists for a United States agency whose lien arises specifically under federal statute. The FmHA, a United States Agency, maintains that this exception applies to it because of the operation of 7 U.S.C. section 1989. This provision states:

The Secretary is authorized to make rules and regulations, prescribe the terms and conditions for making or insuring loans, security instruments and agreements, except as otherwise specified herein, and make such delegations of authority as he deems necessary to carry out this title.

*Id.* The FmHA also cites 7 C.F.R. section 1941.19(e), a regulation promulgated under 7 U.S.C. section 1989. The regulation provides:

(e) Income from products and program payments. Assignments and consents relating to income from products and program payments will be used when necessary to protect FmHA's interest as follows:
(1) Form FmHA 441-8, "Assignment of Proceeds from the Sale of Agricultural Products," for products or income in which FmHA does not have a security interest under UCC. Other forms approved by OGC may be used when this form is not adequate.
(2) Form FmHA 441-18, "Consent to Payment of Proceeds from Sale of Farm Products," for products or income, except dairy products, in which FmHA has a security interest under UCC.
(3) Form FmHA 441-25, "Assignment of Proceeds from the Sale of Dairy Products and Release of Security Interest," for dairy products in which FmHA has a security interest under UCC.
(4) Forms provided by ASCS will be used for assignment of incentive and other agricultural program payments.

7 C.F.R. section 1941.19(e). The provisions relied upon by the FmHA are not the equivalent of the types of statutes contemplated by section 770.4(b)(2). That exception only

concerns liens, encumbrances, security interests or other claims arising *specifically* under federal statute. The authorities cited by the FmHA do not create interests in property. They simply allow the FmHA to prescribe the terms for making security agreements and set forth the forms to be used in taking assignments. *Cf. In re Sunberg,* 729 F.2d 561 (8th Cir.1984) (regulations did not affect security interest but rather prevented the government from being entangled in third party disputes). Statutes that create liens generally use precise language. For example, the statute concerning estate tax liens states that "the estate tax imposed ... shall be a lien upon the gross estate...." 26 U.S.C. section 6324. No such language is found in 7 U.S.C. section 1989 or 7 C.F.R. section 1941.19(e). The FmHA has not satisfied the exception to section 770.4(b). Accordingly it is without authority to encumber the certificates.

### III.

■ The FmHA next claims an interest in future program benefits under the administrative offset provisions found at 7 C.F.R. Part 13. The Bankruptcy Code permits creditors to offset debts that are mutual and prepetition. 11 U.S.C. section 553(a).[2] For its argument the FmHA primarily relies upon *In re Matthieson,* 63 B.R. 56 (D.Minn.1986); *In re Greseth,* 78 B.R. 936 (D.Minn.1987); and *In re Ratliff,* 79 B.R. 930 (Bankr.D.Colo.1987).

In *Matthieson,* the debtors enrolled in the 1984 Deficiency Program whereby participants were paid by the government for idling a certain number of tillable acres. The debtors filed bankruptcy under Chapter 7 after enrolling in the program but before certain benefits were disbursed. The debtors also had outstanding debts owed to the ASCS. The question before the court was whether the deficiency payments owed by ASCS to the debtors were

prepetition obligations and subject to offset under 11 U.S.C. section 553. The court ruled that the obligations of ASCS arose at the time the Deficiency Program contract was created and thus offset under section 553 was proper. *Matthieson,* 63 B.R. at 60.

The court in the *Greseth* case adopted the *Matthieson* analysis in addressing whether CRP payments are subject to offset. The debtors had enrolled in CRP prior to filing their Chapter 12 petition. The court found that the debtors and the ASCS assumed mutually enforceable obligations prepetition. *Greseth,* 78 B.R. at 942. The *Ratliff* court reached a similar result in a Chapter 12 case involving an FmHA claim to CRP payments by means of an offset. *Ratliff,* 79 B.R. at 933.

These cases are not controlling for the reasons that the facts in *Matthieson* and *Greseth* do not reach and the decision in *Ratliff* does not analyze the dispositive issue presented here—whether a mutual debt exists between the debtors and the FmHA. The court in *In re Rinehart,* 76 B.R. 746 (Bankr.D.S.D.1987) thoroughly examined the concept of "mutuality" in the context of an attempt by the Small Business Administration (SBA) to offset payments made to the Chapter 12 debtors by the ASCS under the Program. To be mutual, the court stated, "the debts must be in the same right and between the same parties standing in the same capacity." *Id.* at 750 (citations omitted). The SBA argued that the mutuality requirement was met because the debtors owed the SBA and the government owed the debtors. In other words, the SBA contended that it stood "in the same capacity" as the ASCS because it was part of the government. The court rejected this argument. The court found that the SBA and ASCS were distinct entities. It explained that the ASCS was within the Department of Agriculture, whereas the SBA was an independent agency. Fur-

---

**2.** 11 U.S.C. section 553(a) provides in pertinent part:

Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to

the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case....

ther the court noted that the agencies had separate budgets and staffs and that they provided different services.

Although the FmHA and the ASCS are both part of the Department of Agriculture, the differences between the two preclude the FmHA from standing "in the same capacity" as the ASCS for purposes of section 553(a). The ASCS is charged with administering price support and conservation programs. In contrast, the FmHA's primary mission is to provide credit to farmers who are unable to secure credit from commercial sources. The agencies maintain separate staffs and are supervised by different administrators. Moreover, the FmHA has not established that the ASCS and FmHA budgets are related to the extent that payment to the debtors by the ASCS will affect the FmHA budget.

## CONCLUSION AND ORDER

WHEREFORE, based upon the foregoing analysis, the court finds that the FmHA has no interest in the government benefits in question.

THEREFORE, the FmHA's objection to the plan is overruled.